CABAZON BAND OF MISSION INDI-ANS; Eastern Band of Cherokee Indians; Poarch Band of Creek Indians; Pueblo of Isleta; Rumsey Rancheria; San Manuel Band of Mission Indians; Spokane Tribe; Delaware Tribe of Western Oklahoma, Appellants,

v.

NATIONAL INDIAN GAMING COMMISSION, an Agency of the United States; Anthony J. Hope, in His Official Capacity as Chairman of the National Indian Gaming Commission; United States Department of the Interior; Bruce Babbitt, in His Official Capacity as Secretary of the Department of the Interior; Department of Justice; Janet Reno, in Her Official Capacity as Attorney General of the United States, Appellees,

States of Alabama, Arizona, California, Colorado, Connecticut, Florida, Idaho, Kansas, Michigan, Mississippi, Nebraska, North Dakota, South Dakota, Wisconsin, and Wyoming, Intervenors.

No. 93-5255.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 14, 1993.

Decided Jan. 28, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 28, 1994.

Jerome L. Levine, of Supreme Court of California, Los Angeles, CA, pro hac vice, by special leave of court, and Glenn M. Feldman, Phoenix, AZ, argued the cause for appellants. With them on the briefs were Ben Bridgers, Sylva, NC, Howard Dickstein, Sacramento, CA, William R. Perry, Washington, DC, Jerry C. Straus, Washington, DC, Lamar Parrish, Albuquerque, NM, and William J. O'Brien, II, Washington, DC. Philip L. O'Neill, Washington, DC, entered an appearance for appellants Cabazon Band of Mission Indians, Eastern Band of Cherokee Indians, Poarch Band of Creek Indians, Pueblo of Isleta, Rumsey Rancheria, San Manuel Band of Mission Indians, Spokane Tribe, and Delaware Tribe of Western Oklahoma. Hans Walker, Jr., Washington, DC, entered an appearance for appellant Delaware Tribe of Western Oklahoma.

Mark R. Haag, Attorney, U.S. Dept. of Justice, Washington, DC, argued the cause for appellees. With him on the brief were Lois Jane Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, and Edward J. Shawaker, Attorney, U.S. Dept. of Justice, Washington, DC.

Jonathan A. Glogau, Asst. Atty. Gen., Office of Atty. Gen., of State of Fla., Tallahassee, FL, argued the cause and filed the brief for intervenors. Carol Jean Smith and Ronald C. Forehand, Asst. Attys. Gen., Office of

# 634

Atty. Gen., of State of Ala., Montgomery, AL, entered an appearance, for intervenor State of Alabama.

Before: WALD, GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

This is an appeal from the order of the district court, Lamberth, J., granting summary judgment in favor of the defendants National Indian Gaming Commission and its Chairman, the Department of the Interior and its Secretary, and the Department of Justice and the Attorney General; and in favor of the fifteen States listed in the caption as intervenors. *Cabazon Band of Mission Indians v. National Indian Gaming Comm'n*, 827 F.Supp. 26 (D.D.C.1993). Seven federally recognized Indian Tribes, each alleging that it conducted gaming activities on Indian lands within the Tribe's jurisdiction, sued the original defendants for an injunction and a declaratory judgment, claiming that new regulations of the Indian Gaming Commission, promulgated under the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701–2721, were invalid and that the Commission improperly considered certain computerized games to be in a different regulatory category than their non-computerized counterparts. An eighth federally recognized Tribe, the Delaware Tribe of Western Oklahoma, later joined in the action. On September 23, 1993, a panel of this court, over Judge Henderson's dissent, granted the Tribes' motion for an injunction, pending appeal, forbidding the defendants from interfering with the Tribes' use and operation of certain gaming devices. In this expedited appeal, we vacate the injunction and affirm the judgment of the district court.

Congress enacted the Indian Gaming Regulatory Act in the wake of the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107

S.Ct. 1083, 94 L.Ed.2d 244 (1987), holding that State gaming laws could not be enforced on Indian reservations within States otherwise permitting such gaming. With the objective of regulating tribal gaming operations on Indian lands, the Act established the Indian Gaming Commission as an agency within the Department of the Interior, 25 U.S.C. § 2704(a), and conferred upon the Commission the power and duty to monitor Indian gaming activities, to investigate and audit certain types of Indian gaming, to enforce the collection of civil fines, and to "promulgate such regulations and guidelines as it deems appropriate to implement the provisions of" the Act. 25 U.S.C. § 2706.

The Commission's principal responsibilities relate to what the Act designates as "class II gaming." *See* 25 U.S.C. § 2706(b). The Act divides all forms of gaming into three categories. 25 U.S.C. § 2703(6)–(8). "Class I gaming" consists of social games for prizes of minimal value and traditional forms of Indian gaming. 25 U.S.C. § 2703(6). These are considered within a Tribe's exclusive jurisdiction. 25 U.S.C. § 2710(a)(1). "Class II gaming" is "the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith) ... including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, ...." 25 U.S.C. § 2703(7)(A).[1] Class II gaming does not include "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B)(ii). Tribes may engage in class II gaming on Indian lands in any State where such gaming is permitted for any purpose, so long as the particular form of gaming is not otherwise prohibited on Indian lands by federal law. 25 U.S.C. § 2710(b)(1). The Tribe must be the sole owner of the class II gaming enterprise. 25 U.S.C. § 2710(b)(2)(A).[2] The Act restricts the Tribe's use of the revenues from class II gaming and requires the Tribe to maintain a system of controls to ensure the

---

1. Class II gaming also includes non-banking card games otherwise permitted by the State in which the Indian lands are located. 25 U.S.C. § 2703(7).

2. A tribal ordinance or resolution may provide for ownership of class II gaming by another person as long as certain conditions are met. 25 U.S.C. § 2710(b)(4)(A).

integrity of the gaming and the personnel operating it. 25 U.S.C. § 2710(b)(2)(B), (C) and (F). "Class III gaming" encompasses "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). Class III gaming on Indian lands is permitted only if "such gaming is not otherwise specifically prohibited on Indian lands by federal law"; the Tribe enters into a compact governing gaming with the State in which the Indian lands are located; and the Secretary of the Interior approves the Tribal–State compact. 25 U.S.C. § 2710(b)(1)(A), (d)(1) and (d)(8).[3]

The game at issue in this case is "pull-tabs," one of the games included in the definition of class II gaming. The most common form of pull-tabs is the paper version. Gamblers purchase a card from a deck. The set of cards ("the deal") contains a predetermined number of winners. Upon purchasing the card, the gambler pulls the paper tab open to find out if he is a winner. In the paper version each gambler competes against all other gamblers in the hall playing the game. There is now a computerized version of pull-tabs. The computer randomly selects a card for the gambler, pulls the tab at the gambler's direction, and displays the result on the screen. The computer version, like the paper version, has a fixed number of winning cards in each deal. The computers may be interconnected so that each gambler simultaneously plays against other gamblers in "pods" or "banks" of as many as forty machines.

The focus on computer or video pull-tabs reflects a considerable narrowing of the case since the parties appeared before Judge Lamberth. Invoking the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the Tribes then had challenged Commission regulations, promulgated in April 1992 (57 Fed. Reg. 12,382), defining class II gaming (25 C.F.R. § 502.3); class III gaming (25 C.F.R. § 502.4); "electronic, computer, or other technologic aid" (25 C.F.R. § 502.7); and "electronic or electromechanical facsimile" (25 C.F.R. § 502.8). Judge Lamberth's cogent opinion rejected each of the Tribes' arguments against these regulations as "either moot or meritless." 827 F.Supp. at 32.

■ In this appeal, the Tribes have devoted their arguments to a different question, the only one set forth in their Statement of Issues: "Did the district court err in finding that the video pull-tab games at issue in this case are class III 'electronic facsimiles' rather than class II pull-tab games which utilize 'electronic, computer or technologic aids' under §§ 2703(7)(A) and 2703(7)(B)(ii) of the Indian Gaming Regulatory Act and under §§ 502.7 and 502.8 of the Commission's regulations?"[4] Tribes' Brief at 2. This is the question raised by the final count of the Tribes' complaint, which asks for a declaratory judgment. 827 F.Supp. at 32. In ruling on it, we follow Judge Lamberth's carefully reasoned opinion and agree with him that the decision is "a simple one that may be accomplished solely by examining the statute itself

---

**3.** In the District of Columbia, in any possession of the United States, and in Indian country, the Johnson Act makes it unlawful to "possess" or "use" any "gambling device." 15 U.S.C. § 1175. The Johnson Act defines "gambling device" as a "machine or mechanical device" designed "primarily" for gambling and that, when operated, either delivers money or entitles the player to receive money "as the result of the application of an element of chance." 15 U.S.C. § 1171(a)(1) & (2). The Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(6), "repealed the applicability of the Johnson Act for class III devices subject to an extant, effective Tribal–State compact. There is no other repeal of the Johnson Act, either expressed or by implication," in the Indian Gaming Regulatory Act. 827 F.Supp. at 31. Judge Lamberth therefore held that the Johnson Act remained "fully operative" with respect to class II gaming on Indian lands, which is permitted only if "not otherwise specifically prohibited on

Indian lands by federal law." 25 U.S.C. § 2710(b)(1)(A). 827 F.Supp. at 31.

**4.** 25 C.F.R. § 502.7 states:

*Electronic, computer or other technologic aid* means a device such as a computer, telephone, cable, television, satellite or bingo blower and that when used—
(a) Is not a game of chance but merely assists a player or the playing of a game;
(b) Is readily distinguishable from the playing of a game of chance on an electronic or electromechanical facsimile; and
(c) Is operated according to applicable Federal communications law.
25 C.F.R. § 502.8 states:
*Electronic or electromechanical facsimile* means any gambling device as defined in 15 U.S.C. 1171(a)(2) or (3).

(that is, without looking to the Commission's rules)." 827 F.Supp. at 32. There is no need to consider the Tribes' general point that 25 C.F.R. §§ 502.7 and 502.8 sweep too many games otherwise within class II gaming into the category of class III gaming. For whatever might be said about the breadth of the regulations with respect to other games, "without any doubt" computerized pull-tab games of the type involved here "clearly are facsimiles of games of chance and therefore are class III gaming." 827 F.Supp. at 32.

Here, as in the district court, the Tribes concede that the video version of pull-tabs is the same game as the paper version. Tribes' Brief at 24; 827 F.Supp. at 28 n. 2, 32. Because class II gaming does not include "electronic or electromechanical facsimiles of any game of chance" (25 U.S.C. § 2703(7)(B)(ii)), this concession alone demonstrates that the video game is not in the class II category. "By definition, a device that preserves the fundamental characteristics of a game is a facsimile of the game." *Sycuan Band of Mission Indians v. Roache*, (S.D.Cal.1992). As commonly understood, facsimiles are exact copies, or duplicates. Although there may be room for a broader interpretation of "facsimile," the video version of pull-tabs falls within the core meaning of electronic facsimile. It exactly replicates the paper version of the game, and if that is not sufficient to make it a facsimile, we doubt, as did Judge Lamberth (827 F.Supp. at 32), that anything could qualify.

■ The Tribes' contrary position is this: "the *only* point at which the use of electronics or other technology could fall into the class III category is where a different game—a copy, or imitation, something other than the genuine article; in plain English, a 'facsimile'—is created by such technology." All other uses of technology, according to the Tribes, should be considered "aids" within the meaning of § 2703(7)(A). Tribes' Reply Brief at 3–4. We view it as something other than "plain English" to say that only electronic versions of games different from the originals are exact duplicates. The meanings of words in a statute do not necessarily correspond with dictionary definitions. Context

matters. So often does history. Yet there are limits to how far language, written in the formal style of a statute, may be wrenched. We would no sooner take "yes" to signify "no" than we would take "same" to denote only "different." One might stretch "facsimiles" to cover inexact copies, but the possibility of such a construction does not assist the Tribes. Even if the stretch were justified, the consequence would be to expand the category of games defined as facsimiles, not to constrict it. Exact duplicates—such as the video pull-tab games the Tribes wish to operate—would remain covered by § 2703(7)(B)(ii). In short, we agree with Judge Lamberth that, at the least, the Act's exclusion of electronic facsimiles removes games from the class II category when those games are wholly incorporated into an electronic or electromechanical version.

The sentences in the Senate Committee report to which the Tribes refer do not alter our judgment. Near the end of a lengthy paragraph discussing how separate Tribes might coordinate their gaming businesses, the following appears: "Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games.... In other words, such technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players." S.Rep. No. 446, 100th Cong., 2d Sess. 9 (1988), U.S.Code Cong. & Admin.News 1988 pp. 3071, 3079. Pointing to the Report's caution about not using technology to change the "fundamental characteristics" of the games, the Tribes argue that an electronic version of a game cannot be a "facsimile" unless it fundamentally changes the game. While the Report is less than clear about the distinction between electronic aids and electronic facsimiles, Judge Lamberth's response is conclusive when it comes to the Tribes' video pull-tab game. As he wrote, this portion of the Report focuses not on how using technology might create an electronic facsimile, but

on "*communications* technology that might be used to link bingo players in several remote locations." 827 F.Supp. at 33. That sort of technology is, as the Report itself recognizes, distinguishable from electronic facsimiles of the game itself. *See Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1093 (9th Cir.1992). To be sure, the only supposed electronic "facsimiles" mentioned in this paragraph of the Report are those in which "a single participant plays a game with or against a machine rather than with or against other players." Although in video pull-tabs the gambler is playing the game "with … a machine," the Tribes are right that, as in paper pull-tabs, the gambler is playing against other gamblers. But the Tribes are wrong to suppose that the example mentioned in this passage must be the only type of electronic copies Congress meant to include under § 2703(7)(B)(ii). The Report says nothing of the sort and neither does the statute. An illustration given in one sentence of a committee report scarcely excludes the possibility of other examples. Still less does it, rather than the language of the statute, express the will of Congress.

Ambiguous statutes, the Tribes tell us, should be construed in favor of the Indians. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). Congress believed the Indian Gaming Regulatory Act would benefit Indians in several ways. The Tribes focus on the Act's objective of advancing tribal economic interests. The Act has another objective, however: protecting tribes and their members from the dangers associated with large-scale gaming operations. Which construction of the Act favors the Indians, the one including electronic pull-tab games under class II gaming or the one placing this version of the game under the more restrictive category of class III? In this case there is no need to choose. When the statutory language is clear, as it is here, the canon may not be employed. *See South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506, 106 S.Ct. 2039, 2044, 90 L.Ed.2d 490 (1986).

The injunction pending appeal is vacated and the judgment of the district court is affirmed.