38 F.3d 402
 SYCUAN BAND OF MISSION INDIANS; Barona Band of Mission
Indians, a/k/a Barona Group of the Capitan Grande Band of
Mission Indians, a federally-recognized Indian Tribe;
Viejas Band of Mission Indians, a/k/a Viejas Group of the
Capitan Grande Band of Mission Indians, a
federally-recognized Indian Tribe, Plaintiffs-Appellees,
v.
Jim ROACHE, individually and as Sheriff of San Diego County, Defendant,
and
Edwin L. Miller, individually and as District Attorney of
San Diego County, Defendant-Appellant.
SYCUAN BAND OF MISSION INDIANS, Plaintiff-Appellant,
v.
Jim ROACHE, Defendant,
and
Edwin L. Miller, individually and as District Attorney of
San Diego County, Defendant-Appellee.
 Nos. 93-55430, 93-55431.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1994.
Decided Sept. 26, 1994.
 
 Cathy Christian, Manuel Medeiros, Deputy Attys. Gen., Sacramento, CA, for defendant-appellant-cross-appellee.
 George Forman, Alexander & Karshmer, Berkeley, CA, for Sycuan Band of Mission Indians.
 Art Bunce, Escondido, CA, for Barona and Viejas Bands of Mission Indians.
 Appeals from the United States District Court for the Southern District of California.
 Before FLETCHER, CANBY and HALL, Circuit Judges.
 CANBY, Circuit Judge.
 
 
 1
 This appeal presents a conflict over the power of state authorities to prohibit certain forms of Indian gaming. Edwin L. Miller, the District Attorney of San Diego County, California (the State), appeals the district court's injunction forbidding the State's prosecution of certain individuals employed in Indian gaming operations on the reservations of the Barona, Sycuan and Viejas Bands of Mission Indians. On cross-appeal, the Sycuan Band challenges the district court's finding that its video "pull-tab" machines offer Class III games that were operated in violation of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. Secs. 2701-2721. We affirm the district court's judgment in all respects.I. Background
 
 
 2
 After obtaining search warrants in the San Diego Municipal Court, sheriff's deputies raided gaming centers operated by the Barona, Sycuan, and Viejas Bands of Mission Indians on their reservations. The deputies seized gaming machines, cash and records. A short time later, District Attorney Miller commenced prosecutions of four persons employed in the Bands' respective gaming centers. The Bands brought actions in the district court for declaratory relief and injunctions against the state prosecutions.
 
 
 3
 The district court granted declaratory and injunctive relief in favor of the Bands. See 788 F.Supp. 1498 (S.D.Cal.1992). It declared that the county officials were precluded by the Indian Gaming Regulatory Act (IGRA) from jurisdiction to execute the warrants and prosecute the tribal gaming officials. Accordingly, it enjoined the pending prosecutions of these individuals.
 
 
 4
 The district court denied, however, the Sycuan Band's motion to return the seized gaming devices. The district court found that the Band's video pull-tab machines were Class III gaming devices that could be lawfully operated only if authorized by a Tribal-State compact. Because there was no such compact, the district court eventually ordered the San Diego County Sheriff, pursuant to a stipulation, to return the gaming devices to Video Autotab, Inc., the owner and lessor of the gaming devices.
 
 
 5
 The State appeals from the district court's injunction, contending that 42 U.S.C. Sec. 1983 failed to authorize the court to issue an injunction; that the injunction violated the Anti-Injunction Act, 28 U.S.C. Sec. 2283; and that the injunction violated the Younger abstention doctrine. Finally, the State appeals the ruling that it has no criminal jurisdiction over the gambling offenses at issue.
 
 
 6
 On cross-appeal, the Sycuan Band contends that the district court erred in finding that the Band's video "pull-tab" machines are Class III gaming devices. Before reaching that issue, we address the State's appeal.
 
 
 7
 II. The District Court's Authority to Enter an Injunction
 
 
 8
 The State argues that 42 U.S.C. Sec. 1983 cannot support the district court's injunction because the Bands are not "persons" for purposes of that section. We agree with the Sycuan Band, however, that there is no need for us to reach that question.[1] The Bands alleged jurisdiction under 28 U.S.C. Secs. 1331, 1337, and 1362, and the State did not contest those bases of jurisdiction. Section 1331 is enough; this case clearly arises under federal law, be it IGRA or the federal common law of Indian affairs that allocates jurisdiction among the federal government, the tribes, and the states. See National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 850-53, 105 S.Ct. 2447, 2450-52, 85 L.Ed.2d 818 (1985).
 
 
 9
 The State attacks the standing of the tribe to seek an injunction that, among other things, enjoins the prosecution of third parties. The State candidly admits, however, that this argument was not raised in the district court. The argument is therefore waived and we will not entertain it unless the defect in standing deprives us of jurisdiction for lack of a case or controversy. See Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035-36, 97 L.Ed. 1586 (1953) (rule denying standing to raise another's rights is "only a rule of practice," which may be dispensed with in appropriate cases). We have no doubt that we have before us a case and controversy between the Bands and the state authorities. The State's prosecutions, although directed immediately at the individuals conducting the tribal gaming operation, are aimed at stopping the Bands' machine gaming in its tracks. The Bands here are in no different position from that of the Mescalero Tribe in New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). In that case, the Tribe brought an action against New Mexico to enjoin enforcement of the State's game laws against non-Indian hunters and fishers on the Tribe's reservation. Id. at 329-30, 103 S.Ct. at 2383-84. The lower court issued the injunction and the Supreme Court upheld it. Id. at 343, 103 S.Ct. at 2391-92. We therefore see no constitutional or other jurisdictional problem in enforcing the district court's injunction in this case.
 
 
 10
 On the merits, the district court had strong authority for its conclusion that the State lacked jurisdiction to enforce its criminal laws against electronic machine gambling. IGRA extends state laws punishing certain types of gambling into Indian country, 18 U.S.C. Sec. 1166(a), (b), (c), but it also contains a highly explicit limitation on jurisdiction to enforce those laws:
 
 
 11
 The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact ... has consented to the transfer to the State of criminal jurisdiction with respect to the gambling on the lands of the Indian tribe.
 
 
 12
 18 U.S.C. Sec. 1166(d). The Bands have not consented to the transfer of criminal jurisdiction to the State. As far as IGRA is concerned, therefore, the State had no authority to prosecute the Bands' employees for conducting the Bands' gaming. Having correctly so concluded, the district court was well within its equitable power to enjoin the prosecutions, see, e.g., Mescalero Apache Tribe, supra, unless some federal statute or decisional law affirmatively bars the injunction. We discuss those questions below, but first we deal with a final substantive contention of the State.
 
 
 13
 III. IGRA, Public Law 280 and State Criminal Jurisdiction
 
 
 14
 The State points out that section 1166(d) provides for exclusive federal enforcement of state criminal laws "made applicable under this section to Indian country." 18 U.S.C. Sec. 1166(d) (emphasis added). It argues that California had preexisting authority to enforce its criminal laws in Indian country under Public Law 280, 18 U.S.C. Sec. 1162. Accordingly, the State contends that the prosecutions were lawfully maintained under the State's Public Law 280 jurisdiction.
 
 
 15
 We reject the State's arguments for two reasons. First, we do not agree that the State had jurisdiction over the Bands' gaming activities under Public Law 280. That statute granted California and certain other states jurisdiction over criminal violations and civil causes of action on Indian reservations. It left civil regulatory jurisdiction in the hands of the Tribes. Bryan v. Itasca County, 426 U.S. 373, 385, 388-90, 96 S.Ct. 2102, 2111-12, 48 L.Ed.2d 710 (1976) (construing Sec. 4 of Public Law 280, 28 U.S.C. Sec. 1360).
 
 
 16
 In California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208-11, 107 S.Ct. 1083, 1087-88, 94 L.Ed.2d 244 (1987), the Supreme Court made it clear that state law in a Public Law 280 state may be excluded from Indian country as "regulatory" even though the regulatory aspects of the law are enforced by criminal penalties. The key is "whether the conduct at issue violates the State's public policy." Id. at 209, 107 S.Ct. at 1088. In Cabazon Band, the Supreme Court undertook this inquiry in regard to California's attempt to ban high-stakes bingo and certain card games in Indian country, and concluded that the State had no public policy against the gambling: it simply regulated it. Id. at 211, 107 S.Ct. at 1089. Accordingly, California could not prohibit the games in issue, carried on by the Bands in Indian country.
 
 
 17
 The State here points, however, to the Supreme Court's statement in Cabazon that "applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory." Id. at 211 n. 10, 107 S.Ct. at 1089 n. 10. The State argues that Cabazon Band does not control this case, because the issue here is not bingo or card games, but electronic machine gambling that California permits nowhere. We conclude, however, that the State's argument is useful only when applied to the distinctions between classes of gambling set up by IGRA.[2] Insofar as the State's argument is directed at Class II-type gaming, of the sort engaged in by the Tribes in Cabazon Band, the state cannot regulate and prohibit, alternately, game by game and device by device, turning its public policy off and on by minute degrees.[3] Cabazon Band addressed the problem at a higher level of generality than that. The essence of the Supreme Court's holding in Cabazon Band was succinctly set forth by the Court:
 
 
 18
 In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular.... [Accordingly], there is no warrant for California to make arrests on reservations and ... enforce its gambling laws against Indian tribes.
 
 
 19
 Id. at 211, 214, 107 S.Ct. at 1089, 1091. The ruling, after careful analysis of particular laws, was generic: "California regulates rather than prohibits gambling in general and bingo in particular." Id. (emphasis added). The State has shown us no determinative changes in California public policy since Cabazon Band, and that decision controls. Its import is clear. California had no Public Law 280 jurisdiction to enforce its gambling laws against the gaming operations of the Barona, Sycuan, or Viejas Indian Reservations, at least insofar as the Bands were engaged in the type of gaming that would fall within Class II of IGRA.
 
 
 20
 If, on the other hand, the state prosecutions are directed solely at gaming devices that IGRA would classify under Class III (as we hold below the electronic pull-tab games to be), then the effect of IGRA itself is to preclude the state prosecution. IGRA provides that "[t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country" in the absence of a compact providing for state jurisdiction. 18 U.S.C. Sec. 1166(d). The State emphasizes "made applicable under this section" and draws an implication that, if it can find another source (Public Law 280) making its laws applicable in Indian country, then it can prosecute violations. But that conclusion does not follow, nor is it a sensible application of section 1166(d). If, as we hold below, the Bands' electronic pull-tab machines are Class III gaming devices, then section 1166(d) makes the State's law against such machines applicable in Indian country. Section 1166(d) also grants the federal government exclusive power to enforce that law. Even if there were some other route making that same state law applicable in Indian country, the federal government's right to enforce that law is still exclusive. If that exclusivity is incompatible with any provision of Public Law 280, then the Public Law 280 provision has been impliedly repealed by section 1166(d). See United Keetoowah Band of Cherokee Indians v. Oklahoma, ex rel. Moss, 927 F.2d 1170, 1176-81 (10th Cir.1991) (IGRA Sec. 1166(d) occupies Indian gaming field to exclusion of Assimilative Crimes Act, 18 U.S.C. Sec. 13, and its incorporation of state law). Whether IGRA has made broader inroads on Public Law 280 we need not decide; it has clearly made criminal enforcement of the State's laws prohibiting "slot machines" the exclusive province of the federal government.
 
 
 21
 The district court accordingly did not err in rejecting the State's argument that Public Law 280 authorized the state prosecutions of the Bands' gaming officials.
 
 IV. Anti-Injunction Act
 
 22
 The State next contends that, even if its courts were without jurisdiction as a matter of substantive law, the district court was precluded by procedural bars or doctrines from enjoining the state prosecutions. The first such bar urged by the state is the Anti-Injunction Act. Under that Act, federal courts are barred from enjoining state court proceedings "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. Sec. 2283. Because 18 U.S.C. Sec. 1166(d) mandates exclusive federal jurisdiction over the criminal enforcement of Class III state gaming laws in Indian country, the state court proceedings were in derogation of federal jurisdiction. Accordingly, the district court held that the injunction was within two exceptions to the Anti-Injunction Act: it was necessary to preserve federal jurisdiction over Indian gaming and it was "authorized by Act of Congress".[4]
 
 
 23
 Here, state officials took action in derogation of exclusive federal jurisdiction, transgressing the principle of comity between the state and federal government embodied in the Anti-Injunction Act. The individuals prosecuted were principally involved in administering Indian gaming operations and, thus, the actions violated the clear mandate of Cabazon Band and Sec. 1166(d).
 
 
 24
 The injunction was necessary to preserve exclusive federal jurisdiction. The exception applies. See, e.g., Capital Service, Inc. v. NLRB, 347 U.S. 501, 74 S.Ct. 699, 98 L.Ed. 887 (1954) (federal injunction against enforcement of state court order in labor dispute fell within exception because federal law preempts state jurisdiction over unfair labor practices). Because the "necessary in aid of jurisdiction" exception applies, we need not consider whether the "authorized by Act of Congress" exception applies independently. The Anti-Injunction Act did not bar the relief given by the district court.
 
 V. Younger abstention
 
 25
 Abstention pursuant to Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is appropriate if, first, there are ongoing state judicial proceedings; second, the proceedings implicate an important state interest; and third, there is an adequate opportunity in the state proceedings to raise federal questions. Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982).
 
 
 26
 The State fails to meet the second requirement. It is true that, under Sec. 1166(a), all state Class III gambling laws "apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." But in the same breath, Congress granted the United States exclusive jurisdiction to enforce those state laws. 18 U.S.C. Sec. 1166(d). While the State may well have an interest in seeing that the federal government enforces the State's laws in Indian country, it can have no legitimate interest in intruding on the federal government's exclusive jurisdiction to prosecute. Younger abstention is not appropriate in a case in which a "state tribunal is acting beyond its authority." Gartrell Const., Inc. v. Aubry, 940 F.2d 437, 441 (9th Cir.1991).
 
 
 27
 The Tenth Circuit reached the same conclusion under nearly identical circumstances in Seneca-Cayuga Tribe v. Oklahoma, ex rel. Thompson, 874 F.2d 709 (10th Cir.1989). That decision upheld a district court's injunction against a state court proceeding in which the state sought to enjoin operation of a tribal bingo game. The court of appeals pointed out that the threshold jurisdictional issue, whether the State had authority to regulate, was a question of federal, not state law. Id. at 714. As a consequence, Younger abstention was not warranted. Id.
 
 
 28
 Here, too, the threshold issue of the State's jurisdiction to prosecute is a matter of federal, not state, law. The district court correctly declined the invitation to abstain under the Younger doctrine.
 
 
 29
 VI. Classification of video pull-tab as a Class III game
 
 
 30
 In its cross-appeal, the Sycuan Band contests the district court's rulings that its pull-tab machines were Class III gaming devices. The "Autotab Model 101 electronic pull-tab dispenser" is a self-contained unit containing a computer linked to a video monitor and a printer. The player inserts money and sees a video reproduction of a paper pull-tab ticket. The player electronically reveals concealed numbers to determine whether he or she is a winner. If a winner, the player may cause the machine to print out a winning ticket for redemption by a cashier or may add the winning amount to a credit balance for further play. The game retains the fundamental characteristics of the paper version of pull-tab: the video pull-tab machine is programmed with a computer chip that insures a predetermined number of winning tickets from a finite pool of tickets with known prizes.
 
 
 31
 Under IGRA, the basic game of pull-tab falls within Class II. Class II includes "the game of chance commonly known as bingo ... including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. Sec. 2703(7)(A)(i). There is no question, therefore, that if the Sycuan Band were selling tickets on a board or in a deck from which the player peeled off a paper pull-tab, thus revealing whether he or she won a prize, the game would be a Class II game and California, which permits bingo and other gaming for some purposes, could not prohibit it. The dispute in this case arises, however, from the fact that the Bands' pull-tab games are entirely contained within electronic machines. The Sycuan Band and the State draw different conclusions from that fact, and each points to language in IGRA that arguably sustains its position.
 
 
 32
 The Band relies on the parenthetical expression following the listing of "bingo" as a Class II game in IGRA:
 
 
 33
 (i) the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith)--
 
 
 34
 * * * * * *
 
 
 35
 including (if played in the same location) pull-tabs.
 
 
 36
 . . . . .
 
 
 37
 Id. (emphasis added). The State, on the other hand, relies on language following shortly thereafter:
 
 
 38
 (B) The term "class II gaming" does not include--
 
 
 39
 * * * * * *
 
 
 40
 (ii) electronic or electromechanical facsimiles of any game of chance or slot machines of any kind.
 
 
 41
 Id. Sec. 2703(7)(B)(ii) (emphasis added). If the machines in dispute here are excluded from Class II, they fall within Class III, id. Sec. 2703(8), and can be prohibited by the State in the absence of a compact. Id. Sec. 2710(d)(1)(C). Our task, therefore, is to determine whether the machines in issue here are "electronic [or] computer ... aids" to the game of pull-tab, or instead offer "electronic facsimiles" of that game.
 
 
 42
 We conclude that the machines present the player with "electronic facsimiles" of the pull-tab game. We do so in part because it is extremely difficult for us to conceive what Congress meant by the term "facsimile" if it does not include the games played by use of these machines. The first dictionary definition of "facsimile" is "an exact and detailed copy of something." Webster's Third New International Dictionary 813 (1976). The pull-tab machines present self-contained computer games copying the pull-tab principle, and they are played electronically. The District of Columbia Circuit, presented with the same question facing us, came to the same conclusion we do. Cabazon Band of Mission Indians v. National Indian Gaming Commission, 14 F.3d 633 (D.C.Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 2709, 129 L.Ed.2d 836 (1994). "As commonly understood, facsimiles are exact copies, or duplicates. Although there may be room for a broader interpretation of 'facsimile,' the video version of pull-tabs falls within the core meaning of electronic facsimile." Id. at 636. In contrast, as the District of Columbia Circuit also recognized, an "electronic aid" to a Class II game can be viewed as a device that offers some sort of communications technology to permit broader participation in the basic game being played, as when a bingo game is televised to several rooms or locations. See id. at 637.
 
 
 43
 The Sycuan Band argues a contrary conclusion from the same facts. It contends that the machines are mere "aids" because the electronic games are exact duplications of the paper pull-tab game. The Band relies on the Senate committee report for the bill that was to become IGRA:
 
 
 44
 The Committee specifically rejects any inference that tribes should restrict class II games to existing games [sic] sizes, levels of participation, or current technology. The Committee intends that tribes be given the opportunity to take advantage of modern methods of conducting class II games and the language regarding technology is designed to provide maximum flexibility. In this regard, the Committee recognizes that tribes may wish to join with other tribes to coordinate their class II operations and thereby enhance the potential of increasing revenues. For example, linking participant players at various reservations whether in the same or different States, by means of telephone, cable, television or satellite may be a reasonable approach for tribes to take. Simultaneous games participation between and among Reservations can be made practical by use of computers and telecommunications technology as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games and as long as such games are otherwise operated in accordance with applicable Federal communications law. In other words, such technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays a game with or against a machine rather than with or against other players.
 
 
 45
 S.Rep. No. 100-446, 100th Cong., 2d Sess. 9 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3079 (emphasis added). This passage, it seems to us, cuts both ways. It supports the Band's argument that electronic devices are permissible "aids" if they do not alter the "fundamental characteristics" of the game. The Band emphasizes that the computer in electronic pull-tab games duplicates the characteristics of the original game: there are a certain preestablished number of winning tickets and the prizes are known and fixed in advance. Thus, the Band argues, the player plays not against the machine using random odds, but against other players in a closed board.
 
 
 46
 The Band's argument is not without force, but the passage from the Committee report also reinforces the notion that electronic aids are essentially aimed at communications to enable broader participation in a common game. The pull-tab machines have that effect over time, perhaps, but any given player is faced with a self-contained machine into which he or she places money and loses it or receives winning tickets after the electronic operations are conducted.[5] In that sense, the gambler plays "with the machine" even though not against it. The machine is not being used to facilitate "[s]imultaneous games participation between and among Reservations" or even among players on the same reservation. In any event, whatever the implications of the Senate Committee report, we are still left with the statute's plain term "electronic facsimile" (to say nothing of "slot machines of any kind") that is excluded from Class II gaming. That language compels our result.
 
 
 47
 The Sycuan Band questions why Congress would permit as Class II gaming the traditional pull-tab game (with electronic aids to widen participation) and prohibit the same game played entirely electronically in stand-alone machines. We cannot and need not answer that question definitively; Congress has sufficiently dictated the result of this case in the statutory language it chose. It is not inconceivable, however, that Congress had in mind the view that, in casino gambling, the package is part of the product, and that a game wholly contained in a coin-activated machine is a somewhat different product from the same game in live form carried on with the aid of video or computer transmission. At least, Congress could rationally have so found.
 
 
 48
 Finally, we note that our conclusion that these machines offer an "electronic facsimile" of pull-tab is not inconsistent with the regulations devised by the National Indian Gaming Commission to assist in defining Class II games. Under 25 C.F.R. part 502.7, an electronic aid to a Class II game is "a device such as a computer, telephone, cable, television, satellite or bingo blower and that when used-- ... (b) Is readily distinguishable from the playing of a game of chance on an electronic or electromechanical facsimile[.]" The pull-tab machines in issue here are not, in our view, readily distinguishable from a game of chance on an electronic facsimile.
 
 
 49
 We affirm, therefore, the district court's ruling that the Autotab Model 101 video pull-tab machine is "an electronic or mechanical facsimile of a game of chance," properly categorized as Class III under 25 U.S.C. Sec. 2703(7)(B)(ii). The Band cannot employ them in the absence of a Tribal-State compact.[6]
 
 VII. Conclusion
 
 50
 The district court correctly ruled that the State was without jurisdiction to prosecute the Bands' officials for the Bands' conduct of gaming on their reservations. Its injunction was within its equitable power and did not violate the Anti-Injunction Act or the Younger abstention doctrine. The district court also did not err in ruling that operation of the Bands' electronic pull-tab machines constituted Class III gaming under IGRA.
 
 
 51
 The Barona Band and Viejas Band are entitled to their costs on appeal. The Sycuan Band and the State will each bear their own costs. With regard to both the appeal and the cross-appeal, the judgment of the district court is
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 The Barona and Viejas Bands state that they seek attorneys fees for this appeal under 42 U.S.C. Sec. 1988. That request is hereby transferred to the district court, which has not yet ruled on the Bands' request for fees in that court or on the applicability of section 1988 to this litigation
 
 
 [2]
 Admittedly, this approach fuses to some degree the analysis under Public Law 280 with that under IGRA, but the result is consistent with IGRA's purpose, among others, of "the establishment of Federal standards for gaming on Indian lands." 25 U.S.C. Sec. 2702(3)
 
 
 [3]
 Under IGRA, tribes may elect to engage in Class II gaming if located "within a State that permits such gaming for any purpose by any person, organization or entity." 25 U.S.C. Sec. 2710(b)(1)(A)
 
 
 [4]
 The State seeks at once to distinguish and obtain support from White Mountain Apache Tribe v. Smith Plumbing Co., 856 F.2d 1301 (9th Cir.1988). In that case, we held that an injunction against a state proceeding that might have affected Indian property survived the Anti-Injunction Act because the "district court has jurisdiction to preserve the integrity of tribal claims." Id. at 1304. Thus, it fell within the exception for injunctions "necessary in aid of [federal court] jurisdiction." However, we overturned the district court's injunction as improvidently granted because, on closer examination, no Indian property was actually subject to the suit
 Smith Plumbing concerned tribal property claims that the district court believed were in jeopardy absent an injunction. The facts here are different because no property subject to federal court jurisdiction is at stake in a criminal prosecution. Nevertheless, the injunction obtained by the Bands in this case fits well within the language of the exception.
 
 
 [5]
 In the only other case in which we faced the question whether an electronic machine was an "aid" or a "facsimile," we thought it significant that "[t]he player can participate in the game whether or not anyone else is playing at the same time." Spokane Indian Tribe v. United States, 972 F.2d 1090, 1093 (9th Cir.1992). We do not rely on Spokane Tribe, however, because it dealt with a lottery game in which the player did play a game of random chance against the machine, and we also determined that the underlying lottery game itself was Class III gaming. Id. at 1093-95
 
 
 [6]
 There is one other route by which Indian tribes can maintain Class III gambling. If the state fails to bargain in good faith and a federal court orders mediation, and the state fails to enter the compact chosen by the mediator, the Secretary may prescribe procedures under which the tribe may conduct Class III gaming. 25 U.S.C. Sec. 2710(d)(7)(B)(vii)(II). The record does not show that any of the prerequisites for this procedure exist in this case