**UNITED STATES of America, Plaintiff,**

**v.**

**Loretta H. MARTINEZ, Defendant.**

**No. CR 97–0359 JP.**

United States District Court,
D. New Mexico.

Oct. 22, 1997.

Lee P. McMillian, Albuquerque, NM, for Loretta H. Martinez.

Kenneth Martinez, Alcalde, NM, pro se.

Louis E. Valencia, U.S. Attorney's Office, District of New Mexico, Albuquerque, NM, for U.S.

## MEMORANDUM OPINION

PARKER, District Judge.

This opinion addresses the sentence imposed on Loretta Herrera Martinez on October 9, 1997—especially the decision not to require restitution in addition to other penalties. In an Information filed June 10, 1997 Mrs. Martinez was charged with violating 18 U.S.C. § 1152 (Crime on an Indian Reservation) and 18 U.S.C. § 2111 (Armed Robbery). On July 10, 1997 Mrs. Martinez plead guilty to the charge. At a hearing on October 9, 1997 the Court accepted Mrs. Martinez' plea and orally stated a sentence, the terms of which are set forth in a Judgment that is being entered coincident with the filing of this opinion and which are summarized below.

## FACTUAL BACKGROUND

The following facts appear uncontroverted in the record before the Court and are the basis for the determination of a proper and just sentence.

*Mrs. Loretta Herrera Martinez, the person.* Mrs. Martinez entered this world in Alcalde, New Mexico on December 31, 1935, almost sixty-two years ago. Just over forty-five years ago, on September 13, 1952, she married Margarito Martinez in St. John the Baptist Church at San Juan Pueblo. New Mexico. Although Mr. and Mrs. Martinez remain married, Mrs. Martinez reports that her gambling compulsion, which developed after the advent of casinos in New Mexico, has "shattered" their marital relationship. This has "devastated" Mrs. Martinez "because they had many wonderful years together." Mrs. Martinez, with her husband, raised three responsible sons, two are employed by Los Alamos National Laboratory and the eldest works for the Española Hospital. Española, New Mexico. All three children maintain excellent relationships with, and remain very supportive of their mother, as do many members of Mrs. Martinez' extended family.

Mrs. Martinez has an extraordinary, outstanding work history. For twenty-two years, beginning in 1956 when Mrs. Martinez was a young mother and continuing through 1978, Mrs. Martinez worked in various positions in Albuquerque for the United States Atomic Energy Commission, the United States Energy Research and Development Administration, and the United States Department of Energy, from which she received numerous certificates and commendations. Thereafter for almost twenty years, from 1978 to early 1997, Mrs. Martinez worked for several different employers in Española, including Gary Puro, M.D., K.T. Vu, M.D., Chamas and Kelly Accounting Services, Santa Cruz United Methodist Church, Lovelace Health Systems. and Pojoaque Gaming, Inc. Her gambling compulsion intensified while she was working for her last employer, which operates the Cities of Gold Casino.

One day, while off duty, Mrs. Martinez gambled at the casino and hit a $25,000.00 jackpot. The casino gave her a choice of receiving the payoff in cash or in the form of a check. Mrs. Martinez chose a check because she was concerned about having a large sum of cash in her possession. The Cities of Gold Casino issued a check to Mrs. Martinez, but put a "stop payment" order on the check before Mrs. Martinez was able to deposit it two days later, by that time taking the position that Mrs. Martinez was not permitted to gamble at the time she won her large jackpot. The casino then terminated Mrs. Martinez' employment. Since then she has been unemployed for a period of eight months, possibly the longest gap in her forty-one year work history. Unfortunately, because of her age and felony conviction, her prospects for future employment are dim.

Mrs. Martinez lived a long, law-abiding life before succumbing to a compulsive gambling affliction. She had no encounters with the criminal justice system as a juvenile. Her mother demanded religious observance and respect for others. Mrs. Martinez graduated from Albuquerque High School and then embarked on her lengthy, diligent work life. For six decades she exhibited abiding respect for the law. During her appearances in court, Mrs. Martinez always has been pleasant. courteous and respectful. She obviously has been extremely embarrassed by her action that brought her into the criminal justice system. In court, she has demonstrated great, sincere remorse and contrition. On April 28, 1997 when Mrs. Martinez first appeared in federal court, voluntarily without having to be arrested, a United States Magistrate Judge allowed her to stay out of jail on bond with many restrictions on her freedom under strict supervision by the United States Pretrial Services Office. While on that status awaiting trial, Mrs. Martinez read literature about compulsive gambling, attended Gamblers Anonymous meetings, and personally established a weekly Thursday evening meeting at the Sacred Heart of Jesus Church in Española for persons suffering from a compulsive gambling condition.

While under pretrial supervision, Mrs. Martinez also sought medical help for her compulsion. Mrs. Martinez went to Robert G. Hillman, M.D., in Santa Fe, New Mexico. In an evaluation of Mrs. Martinez' condition and progress with treatment, Dr. Hillman reported that despite Mrs. Martinez' desire to cease gambling, initially she was unable to stop and deal with her problem because she was too ashamed of herself to confide in

anyone about her compulsion. However now, after medical assistance, Mrs. Martinez feels a repulsion when she passes by the casinos and, although she accepts responsibility for her former gambling and the crime it led to, she still does not understand how she could have allowed herself to get so immersed in gambling and to commit her consequent robbery of the Camel Rock Casino. It appears that by her participation in Gamblers Anonymous and through medical treatment of her condition, Mrs. Martinez has made great progress in overcoming and managing her serious affliction.

Mrs. Martinez now is destitute. The "Financial Condition: Ability to Pay" section of the Presentence Report, prepared by the United States Probation Office following investigation, reflects that Mrs. Martinez has a negative net worth, i.e., her debts, most of which arose out of her former gambling, substantially exceed her rather meager assets.

*Mrs. Martinez' offense conduct.* The relevant events of April 21, 1997 that led up to the robbery are described later. The actual robbery of the Camel Rock Casino happened in this way: While in her car in the casino parking lot, Mrs. Martinez scribbled a note that stated she wanted bundles of $100s and $50s. Mrs. Martinez put the note in her purse in which she earlier had placed an unloaded pistol. (She had taken a single bullet along earlier in the day with the intent of using it to commit suicide. The bullet was not in the gun or the purse at the time of the robbery.) Mrs. Martinez left the bullet in her car and entered the casino. She took the note from her purse and showed it to a cashier. Mrs. Martinez did not point the gun at the cashier. She did not handle the gun at all or even touch it while she was inside the casino. Nothing in the record indicates that Mrs. Martinez made any verbal or written threats to use the gun. However, when Mrs. Martinez opened her purse before receiving the money, the cashier could see the gun in

the purse. After being handed the money, $7,100.00, Mrs. Martinez left the casino and went to her car. She dropped her purse and the money fell out. She picked up most of the money, but maybe not all of it. After driving away from the casino, Mrs. Martinez threw her purse, which contained the note and possibly some of the money, out of the car window. On arriving home, Mrs. Martinez put the money she had—$5,100.00—in a drawer. The purse, the note, and the missing money have not been found by law enforcement officers or Mrs. Martinez.

## THE NEXUS BETWEEN CASINOS AND MRS. MARTINEZ' CRIMINAL ACT

For what is a full lifetime for many people Ms. Martinez experienced no gambling problem. When Mrs. Martinez was in her mid-to-late fifties, casinos cropped up near Mrs. Martinez' home. The casinos soon beguiled her and by April 21, 1997 when she committed the robbery of Camel Rock Casino, a violent crime, Mrs. Martinez was firmly in their grips. In a period of a few years Mrs. Martinez had gambled away in the casinos an enormous sum of money—her and her husband's savings, plus more that she had borrowed. It is unlikely this would have happened in the absence of the casinos, all of which were being operated outside the law.[1] Nothing in the record of this case suggests that Mrs. Martinez would have robbed anyone or anything other than an illegally operating casino. Mrs. Martinez gave a written statement in which she accepted responsibility for her criminal conduct and explained how casino gaming motivated and contributed to her conduct. The following are relevant excerpts from her statement:

> On Monday, April 21, 1997 after having spent most of the night before at the Camel Rock Casino in Tesuque, NM playing the 25¢ progressive jackpot machines, I got up with a severe headache, feeling extremely depressed. guilty, worthless and hating myself for all of my actions and

---

1. This opinion focuses on the illegality of the Camel Rock Casino's gaming operations prior to and as of April 21, 1997. the date of Mrs. Martinez' offense. Recently, the New Mexico Legislature enacted laws related to gaming and thereafter the State and various Tribes and Pueblos entered into new compacts. This memorandum opinion in no way addresses, and takes no position on, the issue of whether gaming conducted under the new compacts is in accordance with the law.

feeling unable to cope with all the unhappiness that my gambling habits had created for me and my family throughout the last few years.

\* \* \* \* \* \*

After I got back home, I kept thinking about how bad my financial circumstances were, how mucy [sic] money I owe, my mind kept rehashing the Cities of Gold Casino incident where I had, a couple of months earlier won a $25,000.00 jackpot after spending all of my savings and plus. Just thinking what they (Cities of Gold Casino) did to me by stopping payment on the $25,000.00 check and additionally losing my job was just too much for me to bear. I could not shake that thought.

My mind kept racing back and forth to all the negative and unpleasant things brought on by my compulsive gambling. I thought how I had failed my husband of over 40 years, ruined the most wonderful husband-wife relationship; forced him into more debt by having to refinance our mortgage to support/pay off some of my gambling debts until our marriage eventually shattered into a separation.

I kept thinking about my three loving adult sons who throughout their entire lives have brought me nothing but joy with no disgraces whatsoever. They have always shown their love and concern. I thought of how many a time they had expressed their extreme concern for me with regard to my gambling addiction and tried to help me by their counseling and prompting me to seek professional help. I thought of how I must have hurt them when they helped bail me out of financial difficulties. I just could not believe that I had allowed gambling to consume me to this point.

The neglect of my upkeep of my home suddenly became quite obvious and I found myself feeling sick just thinking how much I could have done with all the money I literally gave away to the Indian Casino all these years.

My church came to my mind. A feeling of shame and disgrace overcame me. I had neglected my responsibilities as far as my presence in church and my contributions.

I thought of my beloved mother whom I had recently lost. I had taken care of my mother for over 40 years and I felt I was utterly shattering the precious memories of her upbringing. The dreaded thought of how I spent the money I had to pay on her funeral expenses that dreadful night at the Cities of Gold Casino when I lost all my money to win the $25,000.00 jackpot. It was all just unbearable, I felt miserable. I felt suicidal. I just could not cope with it anymore. I wanted out of my whole misery.

I felt a need to be with my mother at her graves and to be there to pray for God's forgiveness for what I intended to do to myself.

I took a gun and one shell from a drawer where it has been kept for years and years. I put the gun and shell along with a light rain jacket (it was threatening to rain) in the car trunk and got started to Santa Fe.

I stopped at the Camel Rock Casino on the way to Santa Fe, hoping that I could, as in the past, lose myself completely in the gambling but I just couldn't shake my headache and depressed feelings so I decided just to go on with my plans for Santa Fe.

As I approached Santa Fe I decided to head out to the Villa Linda Mall on the south end of town. I thought I could just walk around and try to focus on how I might be able to change my life.

I walked the mall for a good while trying to concentrate on what I could possibly do to change my life for the better but it seemed that the more I thought the worse everything seemed with no apparent solution to the magnitude of problems I had created with my gambling addiction.

I went back to my car in the parking lot, sat there for a good while just watching people going back and forth and could not help but admire and envy those that appeared to be so happy and in control of their lives.

I drove to Rosario Cemetery feeling extremely miserable, knowing what my intentions were. When I got there, I took

the purse with the gun and shell from the trunk. I sobbed for quite a while. I prayed that God would forgive me for ill of my actions. My thoughts raced to my three sons, my young grandson, my two sisters. I suddenly realized none of them deserved the misery that I would cause them by committing this suicidal act. I couldn't do this to them. I didn't want to leave them. I love them all so very much!

\*     \*     \*    · \*     \*     \*

My head by this time feels like it is not a part of me from, all the sobbing I have done all day and also from the terrible undescribable feelings of depression.

I decided to head back home. I drove heading back to Española, my home town. As I approached the Camel Rock Casino I decided to stop and use the restroom and check the dinner buffet line. The minute I walked in I was suddenly overcome by such overwhelming emotions. I hated myself for being there again. I went back to my parked car.

It was there in my parked car that I felt the horrible hatred toward all Indian Casinos overcome me. I felt so confused, betrayed and revengeful. I just decided to go in and take their money as they had been taking it from me all these years.

I took the purse with the gun from the trunk, left the shell behind. I put on some gloves that I had kept there all winter. I hurriedly wrote a note to the effect that I wanted a bundle of $100's and one bundle of $50's and put the note in the purse with the gun. I drove the car up to the front of the casino and I remember much traffic congestion and it seems like people everywhere. I felt sick and trembling.

I parked the car and got out, went inside the casino, stood in line for a cashier, showed the note, got some money, walked out feeling like any second a shot would go through me.

As I attempted to open the car door, I felt I was going to collapse. I dropped the purse, picked it up and some of the money that fell out. I backed up and drove off. I drove a few miles before I had to stop because I became very sick to my stomach

and I felt I was going to pass out. I proceeded to drive home. How I got there I don't know. I remember walking in my home, putting the money in a drawer and then I was sick again.

I got on my knees and confessed to God and petitioned his forgiveness and his help. I felt I was going to die then.

\*     \*     \*     \*     \*     \*

Since that horrible day, I have had nothing but deep painful regret for my actions.

\*     \*     \*     \*     \*     \*

Throughout April 21, 1997, as a result of her extreme mental and emotional problems, Mrs. Martinez basically was in a disoriented state. In the opinion of her treating psychiatrist, Dr. Hillman, Mrs. Martinez' depression at the time was so great that she was not capable of forming a criminal intent. In a report dated October 4, 1997, Dr. Hillman said, in part:

I have been treating Ms. Martinez for several months for a Major Depressive illness. This letter describes Mrs. Martinez's state of mind on April 21, 1997. Mrs. Martinez's gambling had become compulsive and totally out of control. She had become increasing[ly] depressed over her inability to stop her gambling and over the fact that she was severely alienating her husband and children.

\*     \*     \*     \*     \*     \*

In her normal state of mind on the day in question, she would have gone to a priest or a minister or someone from her family. At other times, she's talked with her priest and she's been able to discuss her worries. However, on that day, she felt worthless and she felt that she could never make a come-back from the problem of her gambling. She felt totally hopeless. She felt that killing herself was the only solution to her problems.

It is my professional psychiatric opinion that, at the time of the commission of the act which she pleaded guilty to. Mrs. Loretta Martinez was suffering from a severe mental disease. She was severely depressed and suicidal. She took a gun from her home with the plan of killing herself. When she could not kill herself on

her mother's grave, she later thought that someone would shoot and kill her if she took a gun into the casino. She was extremely distraught, depressed, suicidal and not thinking clearly. She was unable to appreciate the nature and quality of her act. Before entering the Casino for a second time, she removed the bullet from the gun and went back into the Casino with the thought that she would be shot and killed thereby ending her suffering.

It is my professional psychiatric opinion that Mrs. Martinez did not have the intent of robbing the Casino when she reentered it a second time. She wanted to have herself shot and killed. Therefore it is my professional medical opinion that Mrs. Martinez could not have formed the requisite criminal intent to render her criminally culpable in this act partially because of her diminished capacity resulting from her depressive illness.

Moreover, Dr. Hillman warned of a danger of physical harm to Mrs. Martinez from other inmates were she to be imprisoned in a penal institution:

It is my professional medical opinion that given Mrs. Martinez has never been in custody of any kind and given her age, I believe that incarceration would be an extreme psychological and (sic) hardship on Mrs. Martinez. In addition, it is my professional opinion that Mrs. Martinez would be at risk for physical harm from other inmates given her age, anticipated difficulty in adjusting to incarceration and inability to counter aggressive actions.

Although Dr. Hillman's opinions, if heard by a jury at a trial, could have established a complete defense to the criminal charge, Mrs. Martinez entered into a plea agreement with the government, offered a guilty plea to the charge, and accepted responsibility for what she had done. Under these circumstances, while Dr. Hillman's professional beliefs about Mrs. Martinez' mental condition tend to explain her bizarre behavior on April 21, 1997, they do not legally excuse her actions. Her conduct was criminal; it deserves just punishment.

## THE CAMEL ROCK CASINO'S CONDUCT

The Pueblo of Tesuque, which operates the Camel Rock Casino, commenced video gambling during 1992. In February, 1995 Gary Johnson, Governor of the State of New Mexico, and the Pueblo of Tesuque executed a compact that purported to authorize and legitimize the continuance of casino gaming under the provisions of the Indian Gaming Regulator' Act ("IGRA"), 25 U.S.C. §§ 2701–21.

On July 13, 1995 the Supreme Court of New Mexico held that this compact and compacts with other Tribes and Pueblos that had been negotiated and signed by the Governor of the State of New Mexico were invalid. *State ex rel. Clark v. Johnson,* 120 N.M. 562, 904 P.2d 11 (1995). In so ruling, the Supreme Court noted, explicitly, the illegality of casino-style gambling in New Mexico: "Based on our interpretation of state gambling laws as making casino-style gaming illegal, ... we conclude that the compacts executed by the Governor are without legal effect and that no gaming compacts exist between the Tribes and Pueblos and the State of New Mexico." Clark, 120 N.M. at 578, 904 P.2d at 26.

On November 29, 1995, four months later, the Supreme Court of New Mexico held that the use of ai electronic bingo gambling device was illegal under New Mexico law. *Citation Bingo, Ltd. v. Otten,* 121 N.M. 205., 910 P.2d 281 (1995). In its opinion in that case, the Supreme Court again pointed out the illegality of casino gaming:

While the record before this Court does not reveal whether gambling devices traditionally found in casinos have in fact been used in this state for gratuitous amusement or even to make bets, we find no statutory authorization for any 'Las Vegas-night' gambling in New Mexico. We are cited to no authoritative use of the term 'lottery' to include casino-style gaming.

*Citation Bingo,* 121 N.M. at 208 n. 2. 910 P.2d at 283 n. 2.

On June 6, 1996 Chief United States District Judge John E. Conway ruled in *Apache Tribe of the Mescalero Reservation v. New Mexico,* Civ. No. 92–76 JC/WWD, that a

compact similar to the Pueblo of Tesuque compact was invalid under federal law.

On July 12, 1996 United States District Judge Martha Vázquez ruled that the compact between the Pueblo of Tesuque and the State of New Mexico, as well as compacts between the State and other Pueblos, was invalid under federal law. *Pueblo of Santa Ana v. Kelly*, 932 F.Supp. 1284 (D.N.M.1996), *aff'd,* 104 F.3d 1546 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 45, —— L.Ed.2d ——, 66 U.S.L.W. 3254 (U.S. Oct. 6, 1997) (No. 96–1617). In her opinion, Judge Vázquez observed that:

> On November 29, 1995, the New Mexico Supreme Court issued another opinion [in addition to *Clark*] indicating that New Mexico law does not authorize any form of "casino-style gambling" and thus the Tribes have not satisfied the requirement that Class III gaming activities be located in a state which permits such gaming for any purpose by any person.

*Santa Ana,* 932 F.Supp. at 1290 (citing *Citation Bingo,* 121 N.M. at 207–08 n. 2, 910 P.2d at 283–84 n. 2). Judge Vázquez described the contentions of the parties thusly:

> Based on *Clark* and *Citation Bingo,* the United States Attorney took the position that the Tribes' Class III gaming activities are in violation of federal law. The United States Attorney warned the Tribes that their gaming activities must cease or casino employees and patrons will be subject to federal criminal sanctions and the alleged illegal gaming devices will be subject to forfeiture. The Tribes assert through this action that their compacts with the State are valid and in effect pursuant to federal *law* and that the scope of gaming they offer was permitted.... The Tribes seek a declaration of their right to continue conducting gaming activities on their reservations. The United States filed a counterclaim asserting that the Tribes' gaming activities fail to satisfy the requirements of IGRA and are therefore unlawful.

*Santa Ana,* 932 F.Supp. at 1290–91.

After a thorough analysis of the pertinent law. Judge Vázquez concluded that the compacts were invalid as a matter of federal law, stating "In sum, the Court has ruled that the Tribal–State compacts are invalid and thus the Tribes have failed to satisfy a requirement necessary for them to conduct Class III gaming." Id. at 1297.

On September 18, 1996 in *Jicarilla Apache Tribe v. Kelly,* Civ. No. 96–700 JP/LFG, I declared the compact between the Jicarilla Apache Tribe and the State of New Mexico, which was essentially the same as the Pueblo of Tesuque compact, to be invalid under federal law.

On January 10, 1997 the United States Court of Appeals for the Tenth Circuit affirmed Judge Vázquez' ruling and held that the compacts, including that of the Pueblo of Tesuque, were invalid under federal law. *Pueblo of Santa Ana v. Kelly,* 104 F.3d 1546 (10th Cir.1997) Two weeks ago, the Supreme Court of the United States denied the Pueblos' petition for writ of certiorari and thereby left standing the opinions of the Tenth Circuit and Judge Vázquez. *Pueblo of Santa Ana v. Kelly,* —— U.S. ——, 118 S.Ct. 45, —— L.Ed.2d —— (1997).

Hence, before Mrs. Martinez robbed the Camel Rock Casino on April 21, 1997, all of the Justices of the Supreme Court of New Mexico who had considered the question, plus a Judge of the New Mexico Court of Appeals who sat by designation in the Clark case, had expressed the view that casino gaming, such as that being conducted by the Camel Rock Casino, was illegal under the law of the State of New Mexico. In addition, six federal court judges, three in the District of New Mexico and three on the Court of Appeals. had said, before April 21, 1997, that the compacts were invalid under federal law and, therefore, the casino gaming being conducted by the Pueblos and Tribes was illegal. No state or federal judge had reached a contrary conclusion.

## EFFECT OF COURT STAYS

Both Judge Vázquez and the Court of Appeals ordered stays of their rulings in the civil declaratory judgment action, *Santa Ana,* that had declared casino gaming unlawful. These court stays assisted in deferring crimi-

nal prosecutions.[2] In no sense did the court stays legalize casino gaming activity, legitimize operation of the casinos, or sanitize the gaming proceeds. Casino gambling was unlawful from its inception extending through the 1995 rulings by the New Mexico Supreme Court. This illegality continued after Judge Vázquez, on July 12, 1996, and the Tenth Circuit, on January 10, 1997, declared the various compacts to be invalid under federal law. Casino gaming was still illegal when Mrs. Martinez committed her crime on April 21, 1997. Camel Rock Casino persisted in unlawful conduct despite the clear warnings of the New Mexico Supreme Court that what it was doing was in violation of New Mexico state law. Camel Rock Casino kept operating in the face of Judge Vázquez' ruling, affirmed by the Tenth Circuit, that its activity was contrary to law, albeit under order of court stays that insulated the casino, temporarily, from criminal prosecution.[3]

### THE SENTENCE IMPOSED ON MRS. MARTINEZ

The sentence puts Mrs. Martinez under supervision by the United States Probation Office for a period of five years (until she will be almost 67 years old) and requires her to comply with numerous standard conditions of probation as well as five special conditions:

*First,* Mrs. Martinez must be confined to her home for six months under electronic monitoring (wearing at all times an unremovable electronic ankle bracelet) that will assure her compliance with permission to leave her residence only to work if she can find employment, to attend religious services, and to participate in a Gamblers Anonymous program in Española, where she lives;

*Second,* throughout the period of probation Mrs. Martinez must continue her involvement with the weekly Gamblers Anonymous group meetings in Española;

*Third,* Mrs. Martinez must not possess firearms, explosives or other dangerous weapons;

*Fourth,* Mrs. Martinez must participate in a mental health program as directed by the United States Probation Office; and

*Fifth,* Mrs. Martinez must grant the United States Probation Office access to any financial information the Office requests.

In addition, the Court ordered Mrs. Martinez to pay to the United States of America a special penalty assessment of one hundred dollars in accordance with 18 U.S.C. § 3013(a)(2)(A).

Moreover, as a consequence of the Court's acceptance of her guilty plea, Mrs. Martinez lost valuable rights of citizenship which include the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm.

The Court decided not to order restitution in addition to these penalties for the reasons explained below.

---

**2.** The United States Attorney for the District of New Mexico had entered into agreements not to prosecute those entities that were engaged in Class III gaming while the issue of the validity of the gaming compacts was before the courts in the *Santa Ana* civil case. As a result, the stay issued by Judge Vázquez in *Santa Ana* allowed the casinos to operate without fear of criminal prosecution during the appeal process. The stay issued by the Tenth Circuit in *Santa Ana* permitted the same result "pending final resolution of this matter, either in this court or the United States Supreme Court." *Santa Ana,* 104 F.3d at 1559. On October 6, 1997, the Supreme Court denied the Pueblos' petition for writ of certiorari. —— U.S. ——, 118 S.Ct. 45, —— L.Ed.2d —— (1997).

**3.** Given the lucrative nature of casino operations and the comfort of knowing that their continuance—until final resolution of the *Santa Ana* civil

declaratory action—would not result in criminal prosecution, it is understandable that the Camel Rock Casino did not close its gambling operations in the face of the judicial pronouncements of illegality. However, the essential character of those operations did not change—they remained unlawful. The non-prosecution agreements between the United States Attorney's Office and the various Pueblos and Tribes merely shielded those involved in gaming operations from criminal prosecution pending resolution of the ongoing *Santa Ana* case; it did not make the gaming legal. When the courts, in the *Santa Ana,* the *Mescalero,* and the *Jicarilla* civil actions, declared the compacts which were necessary for the tribes to conduct Class III gaming to be invalid, they had gone as far as they could go. It was up to the United States Department of Justice, in its discretion and at a time it deemed to be appropriate, to prosecute those involved in the illegal operations.

The sentence of five years probation with highly restrictive conditions was determined in accordance with provisions of the United States Sentencing Guidelines ("USSG") which govern sentences imposed by federal judges. United States Sentencing Commission, *Guidelines Manual,* § 3E1.1 (Nov. 1995). Under the applicable statute, Mrs. Martinez was eligible for probation. 18 U.S.C. § 3561(a). The USSG, however, specified a guideline range of 33 to 41 months imprisonment unless USSG § 5K2.0 or other sections of the USSG justified a departure below the guideline range. 18 U.S.C. § 3553(b). In the plea agreement between Mrs. Martinez and the government, the United States of America stipulated that there were grounds for a downward departure under USSG § 5K2.0. The attorney for Mrs. Martinez filed a Motion for Downward Departure and in its Response, the United States of America concurred: "The United States believes there are grounds for a downward departure from the applicable guidelines pursuant to U.S.S.G. § 5K2.0." At the sentencing hearing counsel for the government agreed that the court could depart downward to any extent.

The USSG expressly contemplate departures to probation in cases that involve "single acts of aberrant behavior." USSG Ch. 1, Pt. A, intro. comment 4(d). The record before the Court demonstrates, without question, that Mrs. Martinez' criminal conduct on April 21, 1997 was a single act of aberrant behavior. Although that, alone, supported a sentence of probation, many other factors reinforced a probationary sentence.

■ The USSG identify numerous matters that should be taken into account in evaluating the propriety of a departure under USSG § 5K2.0. Quite a few apply in this case. Last year the Supreme Court of the United States exhaustively reviewed the rules to be followed by District Judges when considering departures. *Koon v. United States,* —— U.S. ——, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (regarding sentencing of police officers in the Rodney King case). The Court observed that certain factors are "encouraged" by the Sentencing Commission to be a basis for departure, some are "discouraged," and others are "forbidden." *Id.* at ——, 116 S.Ct. at 2045. Although a discouraged factor, standing alone, may be an insufficient basis for a § 5K2.0 departure, several such factors, in combination, may allow a judge to depart under § 5K2.0 if they are present to an exceptional degree or in some other way make the case different from the ordinary case in which such factors are present. *See, e.g., United Sates v. Collins,* 122 F.3d 1297, 1308 (10th Cir.1997) (applying a two-step analysis of (1) relying on permissible factors and (2) determining whether combination of factors warrants downward departure); *United States v. Bowser,* 941 F.2d 1019, 1025 (10th Cir.1991) (holding district court did not err in considering combination of factors).

■ In this case several factors, which ordinarily are not relevant in determining whether a sentence should be outside the guideline range, are present to an exceptional degree and, in combination, remove this case from the "heartland" of cases to which the guidelines are intended to apply. USSG Ch. 1, Pt. A, intro. comment 4(b). Those factors include Mrs. Martinez' age (USSG § 5H1.1, p.s.), mental and emotional condition (USSG § 5H1.3, p.s.), employment record (USSG § 5H1.5, p.s.), family ties (USSG § 5H1.6, p.s.), and employment-related contributions (USSG § 5H1.12, p.s.).

In *Koon,* the United States Supreme Court ruled that the District Judge had correctly made two separate downward departures under USSG sections other than § 5K2.0 based on factors that also are present in this case. First, the Supreme Court approved a very substantial downward departure under § 5K2.10 based on the victim's wrongful conduct, pointing out that this is an encouraged basis for departing. *Koon,* at ——, 116 S.Ct. at 2048. As noted above, the illegal gaming by the Camel Rock Casino contributed to Mrs. Martinez' commission of the offense in this case. Second, without referring to a particular USSG section, the Supreme Court affirmed the District Judge's additional departure grounded on a finding that the defendants were particularly likely to be targets of abuse during incarceration, stating, "The District Court's conclusion that this factor made the case unusual is just the sort

of determination that must be accorded deference by the appellate courts." *Koon*, —— U.S.. at ——, 116 S.Ct. at 2053. This principle applies to Mrs. Martinez. Dr. Hillman opined that, if imprisoned, she would be at risk for physical harm from other inmates for various reasons. Dr. Hillman's opinion stands unchallenged in the record and I give it credence.

Congressional statutes, the USSG, the opinions of the Circuit Courts, and the Supreme Court's opinion in *Koon* all favor a sentence of probation in this case.

## RIGHT OF VICTIM TO SPEAK AT SENTENCING

Under Federal Rule of Criminal Procedure 32(c)(3)(E), a victim of a crime of violence is afforded the opportunity to make a statement or provide information related to a sentence at a defendant's sentencing hearing. The court has welcomed such statements and finds them helpful in assisting the court in fashioning an appropriate sentence.[4] No one from the Camel Rock Casino appeared at Mrs. Martinez' sentencing hearing to offer a victim impact statement. However, if the Camel Rock Casino believes that it has a valid legal claim, it is not precluded from suing Mrs. Martinez in a civil action.[5]

## RESTITUTION

In deciding whether to order Mrs. Martinez to pay restitution to the Camel Rock Casino, it was necessary to consider both the Victim and Witness Protection Act of 1982

---

**4.** Last week, on October 15, 1997, I sentenced a defendant to 150 months imprisonment For the crime of armed bank robbery. At the sentencing hearing, a victim related how the crime had impacted her life and the lives of others.

**5.** Whether it would be successful in such an action is another matter. *See infra* at Note 8.

**6.** An issue of note that was not raised in this case is the constitutionality of the MVRA. Because the MVRA is a relatively new statute, there are few reported decisions interpreting it. Senior United States District Judge William M. Acker, Jr., however, found the statute to be unconstitutional as applied in the case of *United States v. Kemp*, 938 F.Supp. 1554 (N.D.Ala.1996). On the other hand, United States District Judge Malcolm F. Marsh concluded that the MVRA did not violate the Eighth Amendment. *United States v. Dean*,

---

("VWPA"), 18 U.S.C. § 3663, and the Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A.

### – The VWPA

■ The VWPA directs a sentencing judge to consider various factors including the amount of the loss sustained by the victim, 18 U.S.C. § 3663(a)(1)(B)(i)(I); the defendant's financial resources, needs and earning ability, 18 U.S.C. § 3663(a)(1)(B)(i)(II); and other appropriate factors. The casino's $2,000.00 loss was minuscule compared to its revenues. Mrs. Martinez lacks sufficient resources to pay restitution, has significant financial needs as a result of her large debt, has been unemployed for a protracted period, and has a limited earning ability, if any. Clearly, restitution should not be ordered under the terms of the VWPA.

### – The MVRA [6]

■ At first blush, the MVRA would appear to require an order that Mrs. Martinez pay restitution to the casino. The MVRA states that "Notwithstanding any other provision of law, when sentencing a defendant convicted of a [crime of violence], the court shall order, in addition to ... any other penalty authorized by law, that the defendant make restitution to the victim of the offense...." 18 U.S.C. § 3663A(a)(1). While it has long been a canon of statutory construction that the language of a statute which is unambiguous must be given effect without regard to Congressional intent,[7] that canon is

---

949 F.Supp. 782 (D.Or.1996). Although the constitutionality of the MVRA presents an interesting question, it was not raised by either party in this case. Courts should avoid deciding constitutional issues if at all possible. *See, e.g., Escambia County v. McMillan*, 466 U.S. 48, 51, 104 S.Ct. 1577, 1579, 80 L.Ed.2d 36 (1984) (per curiam) (stating that "normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."). Hence, the issue in this case was disposed of on an alternative ground.

**7.** A sampling of the Supreme Court's discussion of this issue includes *Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991) (observing that "this Court repeated with some frequency: Where ... the resolution of a question of federal law turns on a statute and the

not absolute. Justice Scalia, arguably the ultimate textualist, has recognized the limitations on strict statutory construction, stating, "[I]f the language of a statute is clear, that language must be given effect—at least in the absence of a patent absurdity." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 452, 107 S.Ct. 1207, 1224, 94 L.Ed.2d 434 (1987) (Scalia, J. concurring). Ordering Mrs. Martinez to make restitution to the Camel Rock Casino would be patently absurd.

It is intuitively obvious that Congress did not intend to have the federal judiciary take the lead in rewarding. through restitution orders, persons robbed of monies they had obtained by unlawful means, especially where as a matter of policy, federal courts generally would not award those monies were they sought in a civil action.[8] This is especially true when the person who would benefit has violated federal laws.[9]

The absurdity of an order of restitution in this case is magnified when one considers that, because $2,000.00 of the $7,100.00 taken from the casino has not been found, such an order would require Mrs. Martinez, who has no job and a negative net worth, somehow to find funds to be paid to an entity that was operating contrary to law at the time of her offense. Although Mrs. Martinez' actions

should in no way be condoned, this court cannot get involved in helping collect money for an entity that was operating unlawfully.

A comparison of two very similar hypothetical situations—with one significant difference—may help explain why a court should order restitution only to law abiding entities. In the first case, to support an addiction, a person who is addicted to alcohol robs a liquor store that is licensed for a fee by the state to sell spirits legally. In the second case, to get money to support a cocaine habit, a person addicted to cocaine robs a dealer who sells the cocaine illegally. Both robbers commit the same crime for the same reason. Each robber will be punished for his crime against the people—of the United States or a state—by being sentenced to imprisonment or probation with restrictions on freedom. Both sellers who are robbed sell addictive substances that contribute to the robbers committing criminal acts. However, the liquor merchant makes sales of an addictive substance, alcohol, as authorized by law whereas the cocaine dealer sells contraband in violation of law. To some, this may seem to be a difference so subtle that courts should not make a distinction when deciding to order restitution to the liquor store owner while denying it to the cocaine dealer. How-

intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear. The language of [the statute in question] is not unclear. Thus, although a court appropriately may refer to a statute's legislative history to resolve statutory ambiguity, there is no need to do so here.") (internal quotation marks omitted); *Conroy v. Aniskoff,* 507 U.S. 511, 528, 113 S.Ct. 1562, 1572, 123 L.Ed.2d 229 (1993) ("The language of the statute is entirely clear, and if that is not what Congress meant then Congress has made a mistake and Congress will have to correct it. We should not pretend to care about legislative intent (as opposed to the meaning of the law), lest we impose upon the practicing bar and their clients obligations that we do not ourselves take seriously."); and *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.")

**8.** *See, e.g., Wilshire Oil Co. of Tex. v. Riffe,* 409 F.2d 1277, 1283 (10th Cir.1969) ("Stated generally, the rule is that where the plaintiff's conduct

in connection with the transaction upon which his claim is based was illegal and criminal the courts will deny him relief.") (internal quotation marks omitted). *See also, Cole v. Taylor,* 301 N.W.2d 766, 768 (Iowa 1981) ("The general rule is: 'that a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party, or to maintain a claim for damages based on his own wrong or caused by his own neglect, ... or where he must base his cause of action in whole or in part, on a violation by himself of the criminal or penal laws.' ") (quoting 1 C.J.S. Actions § 13 pp. 996–97). *Accord Feltner v. Casey Family Program,* 902 P.2d 206, 208–09 (Wyo.1995) (and cases cited therein); *Clouse v. Myers,* 753 S.W.2d 316, 319 (Mo.Ct.App.1988).

**9.** Judge Vázquez and the Tenth Circuit in *Santa Ana* ruled that the Camel Rock Casino was operating contrary to IGRA. While those involved in operating the casino were never prosecuted, it would appear that a strong argument exists that without a valid compact, the Pueblo of Tesuque was violating the Johnson Act, 15 U.S.C. §§ 1171–78.

ever. courts should, and do, look at it differently.

Courts must be concerned about the propriety of using the court's considerable power to assist someone in recovering a loss. As a matter of principle, courts traditionally have followed a policy of closing the courthouse doors to persons seeking, through civil lawsuits, to collect debts that arise from unlawful activities. *See supra* at Note 8. That principle should apply, likewise, when a court decides whether, by ordering restitution as part of a sentence in a criminal case, to help someone (the liquor merchant) whose legally earned money is stolen while declining to help another (the cocaine dealer) whose stolen money had been obtained illegally. That principle guided the court in its decision to refrain from giving its imprimatur to the operation of the Camel Rock Casino by ordering Mrs. Martinez to pay restitution.

In addition to lending its stamp of approval to an unlawful activity, the court would, as a result of issuing an order of restitution, have become entangled in the casino's illegal operations. An order of restitution includes a direction that payments must be made to the Clerk of the Court, who collects the payments on behalf of the designated recipients and remits the payments to them.[10] If Mrs. Martinez were ordered to make restitution, she would be required to send whatever payments she could afford to Robert M. March, Clerk of the Court, who would then transmit the funds to the Camel Rock Casino. The United States Probation Office would be monitoring and even promoting Mrs. Martinez' efforts to find money to make restitution payments. In essence, the court would be functioning as the casino's agent in prompting Mrs. Martinez to obtain money for restitution and in collecting it for the casino. The impartiality and dignity of the court would be better preserved by letting the casino attempt to collect the money from Mrs. Martinez in a civil action if the casino believes it has a legally enforceable claim against her.

## CONCLUSION

No court should condone a person robbing another, even if the one robbed is a lawbreaker. The robber should be punished, appropriately, for his or her criminal misconduct. However, in striving to divine what is just punishment in a particular case, a court should not ignore the conduct of the one robbed. Nor should the court be insensitive to the court's role in carrying out ordered punishment.

In this case the defendant, Mrs. Martinez, who was sentenced to five years probation with six months of home detention and other standard and special probationary conditions, robbed the Camel Rock Casino of monies derived from the casino's long-term, unlawful gaming operations. An order of restitution, in addition to the other penalties imposed, would involve the court directly and intimately in returning ill-gotten funds. A court's participation in such an endeavor would, at the least, be unseemly. The federal courts should not be collection agents for scofflaws.

A mural painted by Emil Bisttram under the federal Arts–in–Architecture program during the Great Depression dominates the entry to the courtroom in which Mrs. Martinez was sentenced. The artist incorporated the title of his work. in bold letters, at the base of the mural. It reads: "JUSTICE TEMPERED BY MERCY." In a Lincolnian way, these four words proclaim a powerful, humanized guideline that overarches the more than 140,000 words found in the 396 pages of the United States Sentencing Commission *Guidelines Manual.* They, too, helped guide the sentence imposed on Mrs. Martinez.

---

**10.** Following a directive issued by the Administrative Office for the United States Courts, recently the Clerk of the Court, the United States Probation Office, the United States Pretrial Services Office, and the United States Attorney's Office for the District of New Mexico entered into a memorandum of understanding that sets forth the procedure by which restitution payments are processed in the Court system Under this procedure, defendants tender payment to the Clerk of the Court who, in turn, issues payment to victims. There are a number of reasons for this approach, including verification of payment and elimination of contact between the defendant and the victim.