910 P.2d 281

**CITATION BINGO, LTD., a New Mexico limited partnership, et al., Plaintiffs–Respondents,**

v.

**Robin D. OTTEN, Superintendent of Regulation and Licensing Department of the State of New Mexico, and Marianne Woodard, Director of Alcohol and Gaming Division of New Mexico, Defendants–Petitioners.**

No. 22736.

Supreme Court of New Mexico.

Nov. 29, 1995.

Original Proceeding on Certiorari; Burt Cosgrove, District Judge.

Tom Udall, Attorney General, Joel Cruz–Esparza, Assistant Attorney General, Santa Fe, for Petitioners.

Janet M. Velazquez, Albuquerque, for Respondents.

Victor R. Marshall & Associates, P.C., Victor R. Marshall, Alexis H. Johnson, Albuquerque, for Amici Curiae Clark, Coll & Buffett.

## OPINION

RANSOM, Justice.

1. We issued a writ of certiorari to the Court of Appeals to review whether a hand-held electronic device known as "Power Bingo" is a permissible piece of gaming equipment under the Bingo and Raffle Act, NMSA 1978, §§ 60–2B–1 to –14 (Repl.Pamp. 1991 & Cum.Supp.1995). The Superintendent of the New Mexico Regulation and Li-

censing Department and the Director of the Alcohol and Gaming Division each had made an administrative determination that Power Bingo is not permissible equipment under the Act, and the Department issued a memorandum to all bingo licensees directing them to discontinue use of such devices. Citation Bingo, a supplier of Power Bingo units, thereafter filed a complaint for declaratory relief and sought an injunction against the Department. The trial court entered a declaratory judgment determining that the devices are not excluded under the Act.

2. Following an appeal by the Department, the Court of Appeals issued a memorandum opinion in which it affirmed the trial court's determination. Relying solely on its earlier decision in *Infinity Group, Inc. v. Manzagol*, 118 N.M. 632, 884 P.2d 523 (Ct. App.), *cert. denied*, 118 N.M. 533, 882 P.2d 1046 (1994), the Court reasoned that both a player using a Power Bingo unit and a player using a paper bingo card "would be playing the same game even though the skills of one would not be as tested as the skills of the other." We conclude that Power Bingo units are "gambling devices" within the meaning of NMSA 1978, Section 30–19–2(B) (Repl.Pamp. 1994) (proscribing play of gambling device) and NMSA 1978, Section 30–19–3(F) (Repl. Pamp.1994) (proscribing set up of gambling device). Further, consistent with this state's policy against gambling, we narrowly construe the terms of the Act, and finding no statutory provision that would authorize use of Power Bingo units, we conclude that such units may not be used in New Mexico. We therefore reverse the Court of Appeals and remand to the trial court for entry of a judgment for the Defendants.

3. *Facts.* Power Bingo consists of a plastic case, a keypad with numbers zero through nine, a small black and white display, a connection that allows the unit to accept data from a computer, and a computer chip capable of storing as many as two hundred simulated bingo "cards." These simulated cards are created using a program that randomly generates twenty-four numbers between one and seventy-five. All simulated cards are generated by a single computer and then downloaded into individual Power Bingo units. The precise number of cards a given unit will contain at any one time is determined by the number of cards purchased by the player using that unit.

4. Before the advent of the Power Bingo unit, the game of bingo was played using only paper or hardboard cards. Each paper card consists of a five-by-five matrix containing twenty-four numbered spaces and a center space marked "free." Numbers between one and fifteen inclusive appear in the first column, numbers between sixteen and thirty appear in the second column, numbers between thirty-one and forty-five appear in the third column, numbers between forty-six and sixty appear in the fourth column, and finally, numbers between sixty-one and seventy-five appear in the fifth column. Each column is designated by a letter of the word "bingo," the first column designated as "B" and the fifth column as "O." During the game, the caller draws from a bin one ping pong ball every twelve to fourteen seconds and announces to the hall the letter and number appearing on that ball. The letter is announced only to aid players in finding the correct column. After the letter and number are announced, each player must check all cards he or she is playing to see if there are any matches. If there are, the player marks each match using an ink dauber. As each mark is made, the player must determine whether it completes a pattern that matches a pre-established winning pattern. If it does, the player must call out "bingo" before the next letter and number are announced.

5. Power Bingo does not change the rules of the game, but it does change the method of play. When a letter and number are called, Power Bingo users simply enter the two-digit number into their device using the keypad. For example, if the caller announces "B–6," Power Bingo users simply press "06." The unit then compares the number entered with each of its currently stored numbers, placing the entered number in memory if there is a match. The unit also compares any pattern formed by all numbers so stored against the pre-established winning pattern to see if there is a match. If there is, the unit immediately notifies the user. Thus Power Bingo differs from traditional

bingo in that players of Power Bingo cannot see the cards they have purchased, need not locate and mark numbers on their cards, and need not visually identify any winning pattern.

■ 6. *Gambling is a crime in New Mexico.* With limited exceptions, gambling is a crime in New Mexico. *See* NMSA 1978, §§ 30–19–1 to –15 (Repl.Pamp.1994). Specifically, the legislature has made it a misdemeanor to make a bet (to agree to chance anything of value) or even to be in a gambling place with the intent to make a bet, participate in a lottery, or play a gambling device. Section 30–19–2(A) & (B). Further, the legislature has made it a felony to engage in commercial gambling, which consists of dealing in or setting up any gambling device, participating in the earnings or operation of any gambling place, making book, and conducting or possessing facilities with the intent to conduct a lottery when the consideration and prize are money. Section 30–19–3. A person losing at cards or at a gambling device—or the spouse, children, heirs, and creditors of the person losing—may recover in court any lost money or property. NMSA 1978, §§ 44–5–1 to –14.

7. There are, of course, exceptions to the criminal prohibitions. Licensed pari-mutuel wagering on horse races has been legalized. NMSA 1978, § 60–1–10 (Cum.Supp.1995). Under New Mexico's permissive lottery statute, § 30–19–6, the "sale"[1] or drawing of any prize at a fair is permitted "when all the proceeds of such fair shall be expended in this state for the benefit of [any] church, public library, religious society or charitable purpose[ ] ... and [when] no part of such proceeds go to any individual member or employee thereof." Section 30–19–6(A). Religious, educational, benevolent, and other not-for-profit organizations may operate lotteries twice in any calendar year for the exclusive benefit of such organization or other public purposes. Section 30–19–6(D).

8. In addition to the exceptions created by the permissive lottery statute, the New Mexico Lottery Act, NMSA 1978, §§ 6–24–1 to –34 (Cum.Supp.1995), authorizes for the support of public educational institutions the conduct of "an instant win game in which disposable tickets contain certain preprinted winners," § 6–24–4(F)(1), and "an on-line lottery game in which ... a player selects a specified group of numbers or symbols out of a predetermined range of numbers or symbols and purchases a ticket bearing the player-selected numbers or symbols for eligibility in a [regularly scheduled] drawing," § 6–24–4(F)(2). Video forms of these authorized lotteries are expressly prohibited. Section 6–24–4(F).

■ 9. Finally, under the Bingo and Raffle Act, any licensed organization may conduct games of chance commonly known as "bingo" or "raffles" for educational, charitable, patriotic, religious, or public-spirited purposes. Sections 60–2B–3, 60–2B–8. Such games may not be conducted more than five times in any calendar week, more than four hours on any occasion, or more than twice in one day. Section 60–2B–8(K). In bingo, as we have described, the prizes are awarded on the basis of numbers selected at random to form on the participant's card one or more of seventeen different designated patterns, whereas in raffles the prizes are awarded on the basis of winning names or numbers being "drawn." Any attempt to distinguish "raffles" and "lottery" is superficial at best. What either the courts or legislature has said of the one is applicable to the other.[2]

---

**1.** In his special concurrence in *Harriman Institute of Social Research v. Carrie Tingley Crippled Children's Hospital,* 43 N.M. 1, 19, 84 P.2d 1088, 1099 (1938), Justice Bickley concluded that when it used the term "sale" in the permissive lottery statute, the legislature probably meant a "raffle" whereby the price of a thing to be sold by chance is divided into shares and the shareholder taking possession is chosen by lot.

**2.** In the Criminal Code, "lottery" is defined as "an enterprise other than the New Mexico state lottery established and operated pursuant to the New Mexico Lottery Act ... wherein, for a consideration, the participants are given an opportunity to win a prize, the award of which is determined by chance, even though accompanied by some skill." NMSA 1978, § 30–19–1(C) (Cum. Supp.1995). We can find no indication, however, that by this language the legislature intended to redefine the lottery enterprise to be something other than it is commonly known to be—a "drawing" as provided in Section 30–19–6 for permissive lotteries. *Cf., State ex rel. Clark v. Johnson,* 120 N.M. 562, 572, 904 P.2d 11, 21

10. *Power Bingo is a prohibited gambling device.* Citation Bingo asks this Court to determine that use of Power Bingo is authorized under the Bingo and Raffle Act because it "does not alter the statutory directives on how the game [of bingo] is to be played." As support for its argument, Citation Bingo principally relies on two cases: *Infinity Group* and *State ex rel. Rodriguez v. American Legion Post No. 99*, 106 N.M. 784, 750 P.2d 1110 (Ct.App.), *cert. denied*, 106 N.M. 588, 746 P.2d 1120 (1987), *and cert. denied*, 107 N.M. 16, 751 P.2d 700 (1988).

11. *Infinity Group overruled.* In *Infinity Group* the Court of Appeals held that machines which electronically simulate the game of pull tabs are permissible under the Bingo and Raffle Act. 118 N.M. at 633, 884 P.2d at 524. There, the Regulation and Licensing Department had refused to allow the operation of electronic pull-tab simulations under its definition of pull tabs as "printed tickets that have a pull tab or seal to be opened by the purchaser where a winning combination is printed on each ticket or on a separate card[.]" *Id.* at 634, 884 P.2d at 525 (quoting Definition of Bingo and Raffle Terms, N.M. Regulation and Licensing Dep't Reg. 2B–3(J) (March 21, 1984)). We agree with the Court of Appeals that paper pull-tab games were contemplated by the legislature as a form of the game of chance commonly known as raffles. We also agree with its memorandum opinion in this case that the question of the legality of the electromechanical device used in Power Bingo is governed by the real question identified in *Infinity Group*, namely, "whether *electronic simulations* of pull-tab games are allowed by the Act." *Id.* at 635, 884 P.2d at 526. Consequently, we here review the *Infinity Group* resolution of that question.

12. As in New Mexico, a majority of states continue to prohibit the use or possession of "gambling devices." *See, e.g.*, Kan.

Stat.Ann. 21–4304(e) (Supp.1994); Mich. Comp.Laws Ann. § 750.302 (West 1991); Minn.Stat. § 609.755(5) (1994); Ohio Rev. Code Ann. § 2915.02(A)(5) (Baldwin 1993); 18 Pa.Cons.Stat.Ann. § 5513 (1983); *see generally* Cory Aronovitz, Comment, *To Start, Press the Flashing Button: The Legalization of Video Gambling Devices*, 5 Software L.J. 771 (1992). Courts in these jurisdictions routinely have applied their respective statutory provisions to hold that use of electromechanical devices simulating games of chance is prohibited. *See, e.g.*, *Primages Int'l of Mich. v. Liquor Control Comm'n*, 199 Mich.App. 252, 501 N.W.2d 268 (1993); *Mills–Jennings of Ohio, Inc. v. Department of Liquor Control*, 70 Ohio St.2d 95, 435 N.E.2d 407 (1982); *Commonwealth v. One Electro–Sport Draw Poker Mach., Serial No. 258*, 297 Pa.Super. 54, 443 A.2d 295 (1981).

13. We also find it significant that Congress has chosen to distinguish traditional forms of games such as bingo from electromechanical facsimiles of those games. *See* Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–2721 (1988). The IGRA divides all gaming activities into three classes. It classifies bingo, pull tabs, and similar games as Class II games. The IGRA includes within its definition of Class II games "electronic, computer, or other technologic aids . . . used in connection therewith." 25 U.S.C. § 2703(7)(A)(i). However, the IGRA also classifies as Class III games "electronic or electromechanical facsimiles of *any game of chance.*" 25 U.S.C. § 2703(7)(B)(ii) (emphasis added).

14. In *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 541–43 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 297, 133 L.Ed.2d 203 (1995), the Ninth Circuit Court of Appeals rejected a challenge by the Sycuan Band of Mission Indians to a district court ruling classifying video pull-tab machines as Class III gaming devices that

(1995) (observing that any expansive construction of the term "lottery" in Section 30–19–6 that would authorize a full range of "casino-style" gaming would be contrary to the legislature's general public policy against gambling).

We take judicial notice of recent newspaper references to "the Las Vegas-night law" applicable to charities. While the record before this

Court does not reveal whether gambling devices traditionally found in casinos have in fact been used in this state for gratuitous amusement or even to make bets, we find no statutory authorization for any "Las Vegas-night" gambling in New Mexico. We are cited to no authoritative use of the term "lottery" to include casino-style gaming.

would be illegal without a state compact. Under 25 U.S.C. § 2703(7)(A)(i), Class II games, which are legal even without a state compact, include "the game of chance commonly known as bingo ... including (if played in the same location) pull-tabs." The Sycuan Band argued that its video pull-tab games could not be classified as Class III gaming devices because the IGRA specifically permits "electronic, computer, or other technologic aids" to be used in connection with the Class II game of bingo. *Id.* The Ninth Circuit held that the video pull-tab machines were Class III gaming devices and could not be operated without a compact. The court rejected the Band's argument that these devices were merely electronic aids reasoning that "an 'electronic aid' to a Class II game can be viewed as a device that offers some sort of *communications* technology to permit broader participation in the basic game being played, as when a bingo game is televised to several rooms or locations." *Sycuan Band,* 54 F.3d at 542.

15. The *Sycuan Band* court's reasoning is supported by the following language in the legislative history of the IGRA:

> Simultaneous games participation between and among reservations can be made practical by use of computers and telecommunications technology as long as the use of such technology does not change the fundamental characteristics of the bingo or lotto games.... [S]uch [communications] technology would merely broaden the potential participation levels and is readily distinguishable from the use of electronic facsimiles in which a single participant plays the game with or against a machine rather than with or against other players.

S.Rep. No. 446, 100th Cong., 2d Sess., at 9, 1988 U.S.C.C.A.N. 3071, 3079. Federal regulations promulgated pursuant to the IGRA reflect this same distinction between communications technology used to facilitate broader participation in a conventional game of chance and electronic facsimiles of such conventional games. *Compare* 25 C.F.R. § 502.7(a) *with* 25 C.F.R. § 502.7(b) (distinguishing between device that "merely assists a player or the playing of a game" from one that involves "the playing of a game of chance on an electronic or electromechanical facsimile").

16. It appears then that Congress, by enacting the IGRA, intended to treat electronic facsimiles of existing games of chance differently than those games and that the basis for this disparate treatment was Congress's recognition that electronic versions of a game are fundamentally different than the conventional version of that same game. *See Sycuan Band,* 54 F.3d at 543; *cf. State ex rel. Mountaineer Park, Inc. v. Polan,* 190 W.Va. 276, 438 S.E.2d 308, 315 (1993) (recognizing that "[e]lectronic video lottery, by its very nature, is significantly different from common state-run lottery games"). When Congress enacted the IGRA in 1988, it sought to "protect both the tribes and the gaming public from unscrupulous persons." S.Rep. No. 446, 100th Cong., 2d Sess. 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071. Explaining the reason for excluding slot machines from Class II gaming, the report stated that "[t]he Committee's intent in this instance is to acknowledge the important difference in regulation that such ... machines require." *Id.* at 10, 1988 U.S.C.C.A.N. at 3080. We think federal treatment of gambling devices generally, *see* 15 U.S.C. § 1175 (1988) (prohibiting use of gambling devices on federal and Indian lands), and the reasons underlying Congress's choice to distinguish between electronic aids and electromechanical facsimiles in particular, is instructive here.

17. An examination of state treatment of gambling devices also supports the conclusion that electromechanical versions of authorized games are different than traditional versions of those games and require different regulation. Currently we find only seven states that permit the use of electronic and mechanical gambling devices. In each of these states use of such devices is expressly authorized by statute. *See* La.Rev.Stat.Ann. § 33:4862.6(A)(2) (West Cum.Supp.1995) (authorizing video draw poker); Miss.Code Ann. § 97–33–7(4) (1994) (authorizing use of gambling devices on certain vessels operating in the Mississippi River); Mont.Code Ann. § 23–5–603(2) (1995) (authorizing use of bingo, keno, and draw poker machines); Nevada

Gaming Control Act, Nev.Rev.Stat. §§ 463.010 to .720 (authorizing licensed casino gambling, including slot machines); N.J.Stat.Ann. § 5:12–100 (Cum.Supp.1995) (authorizing use of gaming equipment in licensed casinos); Ore.Rev.Stat. § 461.215 (1991) (authorizing video lottery games); S.D.Codified Laws Ann. § 42–7B–16 (Cum. Supp.1995) (authorizing operation of up to thirty slot machines per license).

18. In determining that electronic simulations of pull tabs are authorized under the Bingo and Raffle Act, the Court of Appeals relied on the fact that "[t]here is nothing in the Act expressly prohibiting electronic versions of [pull-tab games]" and "the Act refers to 'equipment' to be used with respect to raffles, and defines such equipment as 'implements, devices *and machines* designed, intended or used for the conduct of raffles." *Infinity Group*, 118 N.M. at 635, 884 P.2d at 526. Because nothing in the Act expressly prohibits electronic versions of the games authorized therein, the Court concluded that "[i]t is therefore apparent that mechanical devices are generally allowed under the Act." *Id.* To the contrary, because gambling devices are proscribed generally under the criminal statutes of New Mexico, the public policy thus expressed by the legislature requires strict and not expansive interpretation of equipment specifically authorized for gaming under the Bingo and Raffle Act. No other state has authorized electromechanical gaming under an extended interpretation of machines intended or used for raffles. We overrule *Infinity Group* and hold that electronic pull-tab simulations are prohibited electromechanical gambling devices. If the legislature should intend otherwise, it may provide for specific exceptions for electromechanical gaming as have the seven states described above.

19. *Bingo as commonly known.* The legislature has by the Bingo and Raffle Act authorized certain games of chance to be conducted by certain organizations. In defining which games of chance are permitted under the Act, the legislature has stated

"game of chance" means that specific kind of game of chance commonly known as bingo or lotto in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random and that specific kind of game of chance commonly known as raffles which is conducted by drawing for prizes or the allotment of prizes by chance or by the selling of shares, tickets or rights to participate in the game[.]

Section 60–2B–3(M). The Regulation and Licensing Department first cites the use of the phrase "commonly known as bingo or lotto" in the statute and notes that when the legislature passed the Bingo and Raffle Act, bingo was played using only paper or hardboard cards. The Department thus argues that Power Bingo units must be illegal because they were not in use or even in existence when the legislature passed the Bingo and Raffle Act.

20. We refuse to give quite such a restrictive reading to the phrase "commonly known as bingo." We recognize that statutes are not frozen in time and generally should be construed with a view toward accommodating societal and technological evolution. *See State ex rel. Udall v. Public Employees Retirement Bd.,* 120 N.M. 786, 793 n. 5, 907 P.2d 190, 197 n. 5 (1995) (refusing to limit the definition of "compensation" to the meaning understood in 1911). Accepting the Department's argument at face value would sanction absurd results such as a ruling by this Court that use of transparent ink daubers by bingo players is prohibited simply because such daubers were not used when the legislature passed the Act. Such a result was not what the legislature had in mind when it defined "equipment" for bingo as

the receptacle and numbered objects drawn from it; the master board upon which the numbered objects are placed as drawn; the cards or sheets bearing numbers or other designations to be covered and the objects used to cover them; the board or signs, however operated, used to announce or display the numbers or designations as they are drawn; the public address system; and all other articles essential to the operation, conduct and playing of bingo or lotto. . . .

Section 60–2B–3(L).

21. In arriving at an appropriate decision regarding whether use of Power

Bingo is permitted under the Act as the game of chance "commonly known as bingo," we must ascertain and effectuate the intent of the legislature. *See In re Vigil's Estate,* 38 N.M. 383, 385, 34 P.2d 667, 668 (1934). While the primary indicator of legislative intent is the actual language used in the Act, *Winston v. New Mexico State Police Bd.,* 80 N.M. 310, 311, 454 P.2d 967, 968 (1969), when that language is ambiguous or otherwise not determinative we must resort to principles of statutory construction. To aid us in determining legislative intent, we construe the terms of the Act together with the terms of other New Mexico statutes pertaining to the same subject; here, New Mexico's general criminal prohibitions against gambling devices. *See Incorporated County of Los Alamos v. Johnson,* 108 N.M. 633, 634, 776 P.2d 1252, 1253 (1989). In so doing, we presume that the legislature was aware of existing statutory and common law and did not intend to enact a law inconsistent with existing law. *Quintana v. New Mexico Dep't of Corrections,* 100 N.M. 224, 227, 668 P.2d 1101, 1104 (1983). This principle of construction reinforces the notion that judicial repeal of legislation by implication is disfavored. *See Clothier v. Lopez,* 103 N.M. 593, 595, 711 P.2d 870, 872 (1985). Finally, when considering whether the legislature has authorized use of Power Bingo devices, we must, in light of New Mexico's strong public policy against gambling, construe the terms of the Act narrowly.

22. *Power Bingo is inconsistent with the Bingo and Raffle Act.* In *American Legion Post No. 99* the Court reasoned:

If we were to adopt the Clubs' broad definition of "raffles," any game in which a prize is awarded by chance would qualify as a raffle. Organizations licensed under the Act could operate slot machines, roulette wheels, many types of card games, and, in fact, virtually any sort of gambling device as long as the net profits were spent for lawful purposes as defined in the Act. We reject this interpretation. It is not reasonable to assume that the legislature would authorize such widespread gambling without explicitly saying so, and this court must presume that the legislature acted reasonably.

*Id.* 106 N.M. at 786–87, 750 P.2d at 1112–13. We agree with this reasoning, and thus we must reject Citation Bingo's argument that use of Power Bingo units is consistent with the Bingo and Raffle Act because such use does not alter the "essential elements of the game." Our conclusion in this regard is buttressed by decisions from other jurisdictions. For example, the Indiana Court of Appeals also applied a criminal prohibition against "gambling devices" to strike down a proposed offer of tickets for out-of-state lotteries by use of "vending machines" at various Indiana locations. *L.E. Servs., Inc. v. State Lottery Comm'n of Indiana,* 646 N.E.2d 334, 342 (Ind.Ct.App.1995).

23. Section 30–19–1(D) defines a gambling device as "a contrivance other than an antique gambling device that, for a consideration, affords the player an opportunity to obtain anything of value, the award of which is determined by chance, even though accompanied by some skill and whether or not the prize is automatically paid by the device." Section 30–19–2(B) proscribes "entering or remaining in a gambling place with intent to … play a gambling device" and Section 30–19–3(F) proscribes "setting up for use, for the purpose of gambling, or collecting the proceeds of, any gambling device." Reading Section 60–2B–3(L) together with these two criminal prohibitions leads us to the conclusion that Power Bingo units are prohibited gambling devices and cannot be used. While we do not have the benefit of specific electromechanical gaming proscriptions in the Bingo and Raffle Act, the fact that in its most recent Lottery Act the legislature chose to specifically prohibit video forms of the state lottery indicates to us that video, electromechanical, and computer forms of specifically authorized games are against public policy. If Power Bingo units are to be used in New Mexico, express authorization of such devices should come from the legislature.

24. *Conclusion.* Current legislation and the public policy expressed by that legislation do not favor the accommodation of gambling. Narrowly construing the terms of the Bingo and Raffle Act, and finding no express authorization for any sort of electromechanical de-

vice such as Power Bingo, we hold that such devices may not be used. It is for the people acting through their duly elected representatives, and not for this Court, to effect any change in the public policy against gambling.

25. IT IS SO ORDERED.

BACA, C.J., and FRANCHINI, FROST and MINZNER, JJ., concur.