Honorable Elizabeth McLaughlin, Chair Washington State Gambling Commission PO Box 42400 Olympia, Washington 98504-2400
Dear Ms. McLaughlin:
By letter previously acknowledged, you have asked for our opinion on the following questions, which we have paraphrased for clarity:
 1. Is it within the authority of the Gambling Commission to adopt rules revising the definition of the term "pull-tabs" to include video pull-tabs?
 2. If the answer to question one is yes, is it within the authority of the Gambling Commission to limit the authorized use of video pull-tabs to charitable and nonprofit licensees?
 BRIEF ANSWER
As we understand the term, "video pull-tabs" is an electronic game which simulates, on a video screen, the game traditionally called "pull-tabs". Because video pull-tabs lack the essential elements of true pull-tabs, the Gambling Commission lacks the authority to define video pull-tabs as pull-tabs. Because our answer to your first question is in the negative, we do not reach your second question.
 ANALYSIS
A. The statutory background; the commission's delegated powers
The source of your questions is RCW 9.46.0273, defining the terms "punch boards" and "pull-tabs":[1]
 "Punch boards" and "pull-tabs," as used in this chapter, shall be given their usual and ordinary meaning as of July 16, 1973, except that such definition may be revised by the commission pursuant to rules and regulations promulgated pursuant to this chapter.
Id. (emphasis added). Your first question asks how far the commission can go in exercising the discretion granted by the underscored language.
We begin with the familiar proposition that language in a statute should be construed in context. A statute must be considered as a whole with effect given to all the language used. See, e.g., State v. Yakima Cy Comm'rs, 123 Wn.2d 451, 869 P.2d 56 (1994). The original context of what is now RCW 9.46.0273 is the 1973 Gambling Act.[2] Laws of 1973, 1st Ex. Sess., ch. 218. This statute (the first major gambling legislation passed after the state constitution was amended in 1972 to authorize gambling under certain circumstances[3]) authorized certain forms of gambling and created the gambling commission to regulate the authorized activities. Pull-tabs were one of the few forms of gambling authorized in that act:
 The legislature further declares that the conducting of bingo, raffles, and amusement games and the operation of punch boards, pull tabs, and other social pastimes, when conducted pursuant to the provisions of this chapter and any rules and regulations adopted pursuant thereto, are hereby authorized. . . .
Laws of 1973, 1st Ex. Sess., ch. 218, § 1. Subsection 7(1) of the same act authorized the commission to issue licenses to "bona fide charitable or nonprofit organizations . . ." to "utilize punch boards and pull-tabs", and subsection 7(2) permitted similar licenses to "any person, association or organization approved by the commission . . .". Nothing in the 1973 act authorized slot machines or any form of "video game" (the latter had not yet appeared on the market). Indeed, most mechanical forms of gambling are clearly "gambling devices" which were originally defined in section 2(8) of the 1973 act (now, in amended form, RCW 9.46.0241) and specifically declared to be a common nuisance in section 23, which authorized the seizure of gambling devices and prohibited their operation.[4]
The basic elements of the 1973 act are still present in the current scheme of gambling regulation: (1) only certain forms of gambling are authorized; (2) the commission is given a regulatory role; and (3) slot machines and most other "mechanical" forms of gambling are still prohibited. Indeed, the 1994 Legislature specifically amended RCW 9.46.0241 to refer to "video pull-tabs" as an example of a "gambling device". Laws of 1994, ch. 218 § 8.[5]
Given this consistency through nearly three decades of gambling law, we conclude that the authorization in RCW 9.46.0273, taken in context, permits the commission to change the definition of "pull-tab" to include forms of the game meeting the "usual and ordinary" meaning of the term, but not to extend the definition to games or devices which are beyond the common understanding of what a "pull-tab" is.[6] Any broader reading would permit the commission to allow any form of gambling, simply by defining it as a "pull-tab". This would have been a surprising "loophole" in the modest gambling scheme permitted by the 1973 act. Thus, we adopt the alternative reading that any game or object defined as "pull-tab" must be within the common definition of the term.[7]
Although we could find no Washington case law addressing this point, the Kansas Supreme Court addressed an analogous situation in Kansas v. Parrish, 256 Kan. 746, 887 P.2d 127 (1994). The original Kansas constitution, like ours, prohibited all lotteries. In 1972, the Kansas courts had held that bingo games violated this constitutional provision.[8] The people of Kansas then approved an amendment to the Kansas constitution permitting the operation and conduct of "bingo" as defined by law. Kansas Const., art. 15, § 3a. The 1975 Legislature implemented this provision with a law defining bingo much as that term is commonly understood, but the 1993 Legislature purported to authorize a new game called "instant bingo". Parrish, discussion in 256 Kan. at 747-748. The court found that "instant bingo" was the same game as "pull-tabs". Id. After analyzing numerous contentions concerning the asserted similarities and differences among forms of gambling, the court concluded as follows:
 While we recognize the broad power of the legislature under Art. 15, § 3a, we are of the opinion that in defining games of bingo such definition must bear a reasonable and recognizable similarity to the many definitions of bingo and other bingo-type games furnished by counsel and to the common understanding of the term by the people of Kansas. We conclude that the attempt to define pull tab games as games of bingo fails the necessary test and that the legislature has overstepped its bounds with the enactment of the instant bingo amendments.
Id. at 762.
Although the Legislature's delegation to the commission of the power to define pull-tabs is somewhat more explicit than the delegation construed in the Kansas case, we think the same principle should apply: The commission's authority is limited to games which bear a "reasonable and recognizable similarity" to the term "pull tab" as commonly understood.
B. The definition of "pull-tab"; relationship to electronicfacsimile games
Before we can analyze what "video pull-tabs" are, we must tackle the definition of "pull-tab" itself. As noted above, the 1973 Legislature chose not to define the term, other than to refer to its "usual and ordinary meaning". RCW 9.46.0273. We have reviewed both case law and dictionaries of the 1973 period and find that, although the specific language varied, there was a definite consensus on the basic definition of "pull tab". Perhaps the most relevant definition is found in the gambling commission's own regulations. This definition was adopted in 1973 and has remained unchanged since then. Since neither later commissions nor subsequent Legislatures have altered the definition, we assume it accurately represents the legislative intent:
 A "pull-tab" is a single folded or banded ticket or is a card, the face of which is initially covered or otherwise hidden from view to conceal a number, symbol or set of symbols, a few of which numbers or symbols out of every set of pull-tabs have been designated in advance and at random as prize winners, when, for the opportunity to obtain each such folded or banded ticket or card, view the numbers or symbols thereon and possibly obtain a prize winning pull-tab, a person pays some consideration to an operator.
WAC 230-02-260 (filed 12/19/73).
As defined in this rule, the following are the essential elements of a pull-tab:
A folded or banded ticket, or card;
 One or more numbers or symbols on the ticket or card, concealed from view;[9]
 Pre-designation of certain of the numbers or symbols as prize-winners;
 Prize-winners distributed at random within a set of tickets or cards; and
 Payment of consideration for the opportunity to uncover the concealed numbers or symbols, and to win any prize associated with those particular numbers or symbols.
Although the commission has never had occasion to change its 1973 definition of "pull-tab", the commission has adopted, and has revised from time to time, numerous regulations concerning the manufacture and operation of pull-tabs. WAC 230-30. The rules require each pull tab operator to display a flare describing the prizes and winning numbers or symbols for each series of pull-tabs. WAC 230-30-106(4)(a). The flare must disclose the total number of pull-tabs originally in the series (WAC230-30-106(4)(f)), and the winning tickets are "marked off" the flare as played so that a player knows how many prize-winning tabs have not yet been played (WAC 230-30-106(4)(b)). WAC 230-30-103
contains detailed requirements concerning the way pull-tabs must be constructed, and WAC 230-30-102 governs assembly and packaging. WAC 230-30-097 sets standards for the construction of pull tab dispensing devices.[10] Other provisions govern prize structure, the price per play, and certain of the operator's business practices.
With this definition and regulatory scheme in mind, we turn to the matter of "video pull-tabs". This term, of course, is not defined in Washington statute or rule. From cases in other states and from other material at hand, we understand that a "video pull tab" involves the use of a computer and a monitor, with no actual tickets or cards involved.[11] The player manipulates the device with a keyboard, or with switches or other electronic technology, and accesses a program which reveals on the monitor one or more "tickets" which can be made to resemble traditional pull-tabs. The player can then "uncover" the numbers or symbols on the video pull-tabs through some instruction to the computer. If the pull tab is a prize-winner, the computer will so inform the player. Cash prizes could be paid directly by a device connected to the machine, or the player could redeem prizes at another site. Similarly, the player could pay consideration for each play by inserting money or credit cards in the machine, or could pay a cashier off-site before receiving access to the machine.
These "video pull-tabs" would not, of course, meet the definition contained in WAC 230-02-260, because they would not involve any "single folded or banded ticket" or "card". The physical ticket or card would be replaced by a graphic representation on a video screen. The other elements of a "pull-tab" could be approximated by the computer:
 The "video pull-tab" could be initially displayed with its numbers or symbols concealed;
 The prizewinning numbers or symbols could be determined in advance, by the designing of the computer program;
 The prizewinning "tickets" could be distributed at random within a "set" of such "tickets";
 A player could pay consideration for the chance to "open" tickets and win the associated prizes.
Given these differences and similarities, your question is whether RCW 230-02-260 could lawfully be revised to include "video pull-tabs" as described.
The answer to this question requires a determination whether a physical card or ticket is an essential element of a pull-tab. If so, a "video pull-tab" not containing this element could not meet the definition under the standards discussed above. On the other hand, if the physical card or ticket may be substituted with a graphic representation on a screen, the other essentials of a "pull-tab" may be achieved with electronic technology. Although there are arguments for both positions, we think the better argument is that a true "pull-tab" must include a physical card or ticket.
The differing points of view on defining a game are illustrated by a succession of cases in the state of New Mexico. In Infinity Group, Inc. v. Manzagol, 118 N.M. 632, 884 P.2d 523 (1994), cert.denied 1994, the New Mexico Court of Appeals was faced with a question similar to the one you have posed — whether electronic pull-tab games were "pull-tab" games permitted by the New Mexico Bingo and Raffle Act, a 1981 law which had authorized nonprofit organizations to conduct bingo and raffles. The state gambling regulatory agency had adopted rules allowing "jar raffles" and "pull-tabs" but would not allow the operation of electronic devices which simulated the play of pull-tabs. The Court of Appeals decided, in effect, that "pull-tab", in its essence, is a sort of platonic concept which does not depend on the existence of a physical piece of paper but can be played equally well with graphic images on a computer screen. Distinguishing pull-tabs from card games that might involve skill at playing with physical playing cards, the court found:
 These elements of secrecy and skill, however, are lacking in pull tabs, and we do not believe that physically handling cards is a fundamental characteristic of the game. Consequently, Plaintiffs' electronic games, which replicate all of the essential elements of pull tabs, are pull tabs as that game was commonly known in 1981, and as such are allowed under the Act.
Id., 884 P.2d at 525.
More recently, however, the New Mexico Supreme Court reached a different conclusion. In Citation Bingo, Ltd. v. Otten, 121 N.M. 205,910 P.2d 281 (1995), the court was faced with an analogous argument about a game called "Power Bingo", which was played on a hand-held electronic device but simulated the rules and play of the traditional game of "bingo". The court found that Power Bingo was inherently distinct from true "bingo" and was not a lawful game under New Mexico law.[12] The court reasoned as follows:
 a. Gambling is a crime, and laws permitting forms of gambling should be read narrowly;
 b. The Power Bingo device meets the definition in state law of a prohibited "gambling device";
 c. In authorizing bingo and raffles, the Legislature was aware of, and intended to authorize, only paper bingo and pull tab games;
 d. No other states (courts or administrative agencies) had permitted electronic simulations of paper gambling games, except by explicit statutory amendment; and
 e. Both state and federal law, including the Indian Gaming Regulatory Act, commonly treat electronic simulations of games as distinct from their traditional analogues.
In adopting this reasoning, the New Mexico Supreme Court explicitly overruled the Court of Appeals in Infinity Group. Id.,910 P.2d at 284.
All of the factors considered by the New Mexico Supreme Court in reaching this conclusion are equally powerful here. First, although a number of forms of gambling are now authorized in this state, current law is based on a careful effort to balance regulatory and criminal law concerns against a desire to permit social and amusement games. To that end, the introduction to the Gambling Act provides that "[a]ll factors incident to the activities authorized in this chapter shall be closely controlled, and the provisions of this chapter shall be liberally construed to achieve such end." RCW 9.46.010. Given this language, we would read laws permitting forms of gambling narrowly, in favor of "close control".
Second, as noted earlier, the 1994 Legislature explicitly amended RCW 9.46.0241(1) to define "video pull-tabs" as a "gambling device". Gambling devices are generally illegal and subject to seizure and forfeiture. RCW 9.46.231. The commission has authority to authorize certain categories of gambling at "fund raising events" pursuant to RCW 9.46.0233. Although video pull-tabs could conceivably be devised which would not fall within the prohibitions of that statute, the commission's authority should be read in light of the explicit definitions in RCW 9.46.0241, evidence that the Legislature did not intend to authorize video pull-tabs.
This leads to the third point, which is that the 1973 Washington Legislature, like the New Mexico Legislature discussed in the Citation Bingo case, authorized pull-tabs at a time when video pull-tabs had not been invented. Although the Legislature authorized the commission to redefine "pull-tab", the commission should be cautious in assuming that this language was intended to permit the authorization of games the Legislature had not even imagined. Like the New Mexico Supreme Court, and especially in light of the 1994 amendments to RCW 9.46.0241, we think the Legislature did not intend, in delegating the authority to define pull-tabs, to grant the commission authority to include video pull-tabs in the definition. This is especially true in light of the differences between "paper" pull-tabs and electronic pull-tabs: (a) obvious differences in the way "tickets" are manufactured and dispensed; (b) potential differences in the speed of play, with attendant social impact questions; and (c) a necessity of developing a completely different way of regulating the manufacture, sale, and dispensing of "pull-tabs" if they have no separate physical existence but are incorporated into the workings of an electronic device.
Finally, the cases construing the Indian Gaming Regulatory Act (IGRA)[13], while not directly applicable, shed additional light on the most difficult issue presented by your question: Whether the existence of a physical "pull-tab" is essential to the game of "pull-tab". IGRA classifies pull-tab games as Class II gaming, which may be operated by Indian tribes without a compact with the state in which the activity occurs. 25 U.S.C. § 2703(7)(A). However, Class II gaming does not include "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind". 25 U.S.C. § 2703(7)(B)(ii). Thus, these "electronic or electromechanical facsimiles" are Class III gaming, requiring a compact. 25 U.S.C. § 2703(8). Several Indian tribes have argued that "video pull-tabs" and electronic bingo games are the same "games" as their traditional analogues and thus are Class II gaming activities. The two circuit courts considering the issue, however, have both ruled that the video games are "electronic facsimiles" and are therefore different games from those played with paper, even though many elements of the games are the same. Sycuan Band of Mission Indians v. Roache,54 F.3d 535 (9th Cir. 1994), as amended on denial of rehearing (1995); Cabazon Band of Mission Indians v. National Indian Gaming Commission, 14 F.3d 633 (D.C. Cir. 1994). These cases illustrate that Congress, like the state legislatures, treats electronic gambling as a separate category from more "traditional" gambling.
Electronic technology is rapidly expanding, permitting the simulation of almost any game or human activity. Still, no one would define a virtual trip to Paris as true international travel, or a game of computer baseball as equivalent to a real game played in a stadium. Since pull-tabs are far simpler in their essence than travel or baseball, it is easier for a computer to approximate the experience of uncovering hidden numbers on a ticket than the experience of hitting a home run. Still, the principle is the same. The replacement of a paper or cardboard tab with an image on a screen changes a significant element of the game. Since gambling in general is still criminal activity in Washington, we read the statutory authorizations narrowly, and we conclude that video pull-tabs do not clearly enough resemble the traditional forms of pull-tab to justify including them in the definition, absent statutory amendment by the Legislature itself.
Having answered your first question in the negative, we do not reach your second question of whether "pull-tab" could be defined differently for different sets of licensees.
We trust that this analysis will be of assistance to you.
Sincerely,
JAMES K. PHARRIS Senior Assistant Attorney General
[1] You have not asked any questions about punch boards, and we have not researched or analyzed any issues with respect to punch boards in this opinion.
[2] Technically, RCW 9.46.0273 dates only to Laws of 1987, ch. 4, § 19. The 1987 act, however, was merely a recodification of existing statutes for clarification. The numerous definitions, originally all included in RCW 9.46.020, were recodified into a number of separate sections. The Legislature specifically stated that "[t]his separation shall not change the meaning of any of the provisions involved." Laws of 1987, ch. 4, § 1 (uncodified). This act changed former subsection (18) of RCW 9.46.020 into what is now RCW 9.46.0273. The only change in the wording was the reference to the date — July 16, 1973 — which in the 1973 version was "the effective date of this act". It appears that the 1987 Legislature went to considerable trouble to indicate that it did not intend to change the definition of "pull-tabs" (or many other terms) from its 1973 meaning. The 1987 Legislature thus rejected a "floating" or "evolving" sense of the term.
[3] Amendment 56 (amending article II, section 24, of the state constitution) was approved November 7, 1972.
[4] The current equivalent statute, RCW 9.46.231, is very similar.
[5] Certain forms of gambling devices may be authorized in Washington law, however. The definition of "fund raising event", found in RCW 9.46.0233, authorizes the commission to permit "[b]ingo, amusement games, contests of chance, lotteries and raffles" at such events, but provides that "such activities shall not include any mechanical gambling or lottery device activated by the insertion of a coin or by the insertion of any object purchased by any person taking a chance by gambling in respect to the device." In defining "video pull-tabs" explicitly as gambling devices, the 1994 Legislature defined video pull-tabs as a different category of gambling from "traditional" pull-tabs. The 1994 amendments are not consistent with the notion that the Legislature had authorized the commission to define video pull-tabs as pull-tabs.
[6] Our review of the small amount of available legislative history concerning the enactment of the 1973 act reveals nothing specifically addressed to the interpretation of the discretion granted to the commission to re-define pull-tabs.
[7] This by no means renders the commission's discretion meaningless. For instance, the statute allows the commission tonarrow the definition of "pull-tab", particularly if some forms of the game cause regulatory concern. Additionally, to the extent there is any doubt as to the common understanding of the term, the Legislature authorized the commission to resolve the doubt through clarifying definitions which might draw brighter lines than the common understanding.
[8] Kansas v. Nelson, 210 Kan. 439, 502 P.2d 841 (1972).
[9] In the most traditional form, the numbers or symbols are concealed by a paper tab which covers all or part of the ticket. The tab is perforated so that it may be pulled off, revealing the information behind it; thus, the name "pull-tab". More recently, many pull-tabs are covered with latex rather than paper; the latex may be scratched off to uncover the prize information. Either of these forms meets the definition in WAC 230-02-260.
[10] Pull-tabs are sometimes dispensed in an open jar or bowl, where the player, after paying for the opportunity, reaches in and chooses one or more tabs. Other pull-tabs are sold through dispensers which stack the tabs in random order. Some of the devices may be coin-activated. The rules are designed to assure that the tabs are selected in random order and that no one can discover in advance which tabs are prize winners. WAC 230-03-097; 102; 104. As discussed below, there are devices on the market which electronically "read" pull-tabs for players, and some of these also dispense the tabs from a roll contained within the device.
[11] As noted in note 10, above, we understand that there are electronic devices which read, and sometimes dispense, paper pull-tabs. As to one form of these devices, a player obtains one or more pull-tabs somewhere else (such as purchasing them from a cashier or from a separate dispensing device) and then inserts the unopened pull-tabs into an electronic device which can "read" the concealed information and then informs the player whether the ticket is a prize-winner (sometimes to the accompaniment of visible and audible special effects, much as occurs when a slot machine player wins a prize). The device is simply a reader, however, and the player can open the pull-tab without inserting it into the device. We do not understand this device to be a "video pull-tab", but merely a fancy pull-tab reader. Other devices actually dispense the tickets, as well as reading them. So long as there is an actual ticket or card which could be played without using the machine, we think these are still "pull-tabs". The commission could use its regulatory discretion in deciding whether to authorize such devices, however, and with what limitations.
[12] The court noted that Power Bingo was not played in a manner identical to traditional paper bingo. Power Bingo players cannot see the cards they have purchased, need not locate and mark numbers on their cards, and need not visually identify any winning pattern. Citation Bingo, 910 P.2d at 283. However, these slight distinctions were not the basis for the court's holding.
[13] 25 U.S.C. §§ 2701-2721.