2000-NMCA-031

999 P.2d 430

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Bobbie Kelly SUNG, Defendant–Appellee.**

**No. 20,066.**

Court of Appeals of New Mexico.

March 13, 2000.

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, for Appellant.

Lynda Latta, Albuquerque, for Appellee.

## OPINION

BOSSON, Judge.

{1} In this matter of first impression, we are asked to construe New Mexico's criminal custodial interference statute, NMSA 1978, § 30–4–4 (1989), and determine whether the child must be present in New Mexico when criminal acts of custodial interference are committed for New Mexico to have criminal jurisdiction. The district court ruled in the affirmative, and for the following reasons, we agree.

## BACKGROUND

{2} Mother and Father were divorced in 1991 in New Mexico. The parenting plan entered by the First Judicial District Court awarded Father primary physical custody over their child, Hunter, subject to Mother's reasonable visitation. Mother subsequently moved away from New Mexico. In the spring of 1997, the parties agreed that Hunter would stay with Mother for the summer, first at her home in Kentucky and later when Mother took Hunter to Hawaii for a vacation. As part of the agreement, Mother promised to return Hunter to New Mexico on August 4, 1997.

{3} On the appointed day Father took his son to Chicago, and from there Mother took Hunter with her to Kentucky. In due time Mother and Hunter went to Hawaii. However, August 4 came and went without Hunter's return. Mother failed to return Hunter to Father as agreed, and approximately three weeks later Father was forced to go to Hawaii to retrieve his son. Eventually, Mother was held in contempt of court by the First Judicial District Court for violating the parenting plan and the court's order, and Mother was ordered to reimburse Father for his attorney fees and expenses associated with going to Hawaii.

{4} In a separate proceeding, the District Attorney caused Mother to be indicted on one count of custodial interference contrary to Section 30–4–4. The indictment charged that between August 4, 1997, and August 26, 1997, Mother maliciously detained and failed to return Hunter with the intent to deprive Father of his right to custody. Custodial interference is a fourth degree felony. *See* § 30–4–4(B).

{5} Shortly before trial, defense counsel moved to dismiss the indictment for lack of subject matter jurisdiction on the basis of language in the custodial interference statute that limits New Mexico's criminal jurisdiction to instances in which the child is "present in New Mexico at the time of the taking." Section 30–4–4(J). Because Mother did not "take" the child until she assumed possession of him in Chicago, counsel argued that New Mexico did not have jurisdiction over an unlawful detention that occurred wholly outside the state. The district court agreed, dismissing the indictment. The State appeals, seeking to have the indictment reinstated and Mother prosecuted in New Mexico for custodial interference.

## DISCUSSION

{6} Custodial interference is defined as

any person, having a right to custody of a child, maliciously taking, detaining, concealing or enticing away or failing to return that child without good cause and with the intent to deprive permanently or for a protracted time another person also having a right to custody of that child of his right to custody.

Section 30–4–4(B). We assume for purposes of our discussion that a reasonable jury could find that Mother's actions constituted "detaining" and "failing to return" Hunter in violation of this subsection. A different subsection of the same statute imposes a territorial limitation on New Mexico's ability to prosecute: "Violation of the provisions of this section is punishable in New Mexico, whether the intent to commit the offense is formed within or outside the state, if the child was present in New Mexico at the time of the

taking." Section 30–4–4(J). This is the paragraph that Mother argued, and the district court agreed, barred New Mexico from prosecuting in this instance.

{7} We turn now to the multiple arguments for reversal that the State raises on appeal. Initially, the State contends that the text of Subsection J, on its face, does not apply to this prosecution. Subsection J imposes a territorial limitation on a "taking." The child must be present in New Mexico "at the time of the taking" to be prosecuted in New Mexico. The State correctly points out that Subsection B includes within its definition of criminal acts not just "taking," but also "detaining," "enticing," "concealing," and "failing to return." The State contends that the territorial limitation is imposed solely on a "taking," and therefore the alternative ways to commit the crime of custodial interference have no such territorial restriction on the State's ability to enforce the statute in the courts of this state. Thus, the State contends that Subsection J quite simply does not apply to prosecutions for "detaining" or "failing to return," as occurred in this instance.

{8} The State's argument is textually sound, but so is Mother's response. She points out that the text of Subsection J begins, "Violation of the **provisions** of this section...." (Emphasis added.) Use of the plural "provisions" would seem to include Section 30–4–4 in its entirety, as in all "provisions" of the statute. It would follow, then, that the territorial limitations would apply to all "provisions" of Subsection B. With regard to the word "taking" in Subsection J, Mother rejects the notion that this refers only to "taking" as used in Subsection B. The criminal act defined in Subsection B is a "malicious taking." If the legislature had wanted to impose a jurisdictional limitation on only that form of custodial interference, Mother suggests it would have used the terminology of Subsection B, making custodial interference punishable in New Mexico only "if the child was present in New Mexico at the time of the [malicious] taking." Instead, Mother opines that "taking" in Subsection J is used in its generic sense to refer to all the different forms of custodial inter-

ference outlined in Subsection B: detaining, enticing, concealing, failing to return. In Mother's view, these are all merely different forms of "malicious taking." For example, "failing to return" is just a "taking" at the time the child is not returned. Mother's textual argument makes good sense as well.

{9} The State also directs our attention to the legislative history of the custodial interference statute. In its earlier form, promulgated in 1977, custodial interference was defined simply as "the taking from this state" or "enticing to leave this state." 1977 N.M.Laws, ch. 58, § 1. When the present statute was passed in 1989, it removed the phrase "from this state" from the definition section (Subsection B), and added all the other forms of custodial interference such as "detaining" and "failing to return." The new statute then reimposed the same territorial limitation, but in a separate part of the statute, Subsection J, and only on "taking," exactly as it had been in 1977. Thus, the argument goes, the additional forms of custodial interference were not designed with a territorial limitation in mind; otherwise the legislature would have said so. The State's position has a certain logic, but legislative silence is a " 'tenuous guide to determining legislative intent.' " *State v. Henderson,* 116 N.M. 537, 541, 865 P.2d 1181, 1185 (1993) (quoting *Swink v. Fingado,* 115 N.M. 275, 283, 850 P.2d 978, 986 (1993)), *overruled on other grounds by State v. Meadors,* 121 N.M. 38, 46–47, 908 P.2d 731, 739–40 (1995).

{10} Mother counters with a different interpretation of historical events. Since 1977 our legislature has consistently imposed a territorial limitation on the crime of custodial interference, however defined, likely out of concern that it not exceed the scope of the state's authority to prosecute acts taking place outside its geographical limits. *See State v. Benjamin C.,* 109 N.M. 67, 69, 781 P.2d 795, 797 (Ct.App.1989); *State. v. Losolla,* 84 N.M. 151, 152, 500 P.2d 436, 437 (Ct. App.1972) ("[T]he law is that a crime must be prosecuted in the jurisdiction where it was committed."). According to Mother, the legislature in 1989 was simply reworking the basic structure it established in 1977. It was adding different ways in which "taking" a

child could be prosecuted (for example, not returning a child), while it consciously stayed within the same jurisdictional restriction as before.

{11} The State next turns to an argument premised upon the remedial purpose of the custodial interference statute. The State emphasizes that Mother's overly broad interpretation of Subsection J frustrates legislative intent and leaves gaping holes in its protective structure. In this respect, the State may have its strongest argument. Unquestionably, the statute's purpose is to protect children from kidnaping in one form or another. No one can doubt the legitimacy of both the legislative intent and the means selected. The State emphasizes that if New Mexico does not have the authority to prosecute Mother in this case, it is difficult to discern any other state with a similar interest. After all, Mother violated a New Mexico domestic relations order pertaining to child custody and visitation; the child lives here with his Father. The State argues, with considerable force, that dismissal of this charge on jurisdictional grounds will only open the door to clever manipulation by potential kidnapers. If they can figure a way to obtain physical custody outside the state's boundaries, they may "detain" or "fail to return" with impunity.

{12} In support of its legislative purpose argument, the State points to analogous areas of the law in which the courts have devised doctrines like "continuing crime" to justify New Mexico asserting jurisdiction over criminal acts begun elsewhere but causing harm within this state. *See State v. Stephens*, 110 N.M. 525, 526, 797 P.2d 314, 315 (Ct.App.1990) (larceny); *State v. Villalobos*, 120 N.M. 694, 697–98, 905 P.2d 732, 735–36 (Ct.App.1995) (conspiracy). The State points to statutes like the crime of escape, which is committed by the omission of a duty to return, even if the inmate is on furlough outside New Mexico at the time he is obliged to return to prison. *See State v. Hill*, 117 N.M. 807, 808, 877 P.2d 1110, 1111 (Ct.App. 1994). A similar example would be failing to support a child, which becomes criminal child abandonment in New Mexico even if the parent resides outside the confines of the state. *Cf. People v. Jones*, 257 Cal.App.2d 235, 64 Cal.Rptr. 622, 623 (1967). The State notes that custodial interference, in all its statutory forms, essentially amounts to violating a duty that arises in this state, and therefore New Mexico has both a legitimate interest, and the lawful power, to legislate broadly for the protection of its children.

{13} We accept the State's characterization of legislative purpose. We have no quarrel with the argument that a territorial limitation on prosecution, as advocated by Mother in this instance, does indeed leave a void in the protective legislative scheme, and we acknowledge that the void is difficult to justify with respect to the acts Mother is accused of committing in this case. We assume, without deciding, that New Mexico could expand its prosecutorial jurisdiction beyond the narrow scope adopted in the district court's interpretation of Subsection J, and we further assume that New Mexico could do so in a manner consistent with the federal constitution. However, these assumptions do not cure what we see as the essential weakness in the State's position.

{14} At its best, Section 30–4–4 is poorly written. Even the State concedes that the statute is ambiguous. Each side in this appeal makes sound, persuasive arguments for its own interpretation of a statute which, on its face, is far from clear. The State resorts to standard canons of statutory construction (e.g., plain meaning, legislative purpose) to resolve the ambiguity in its favor. As its authority for an expansive interpretation of the statute's reach, the State relies primarily on case law dealing with civil disputes. *See, e.g., Citation Bingo, Ltd. v. Otten*, 121 N.M. 205, 910 P.2d 281 (1995); *Draper v. Mountain States Mut. Cas. Co.*, 116 N.M. 775, 867 P.2d 1157 (1994); *Citizens for Incorporation, Inc. v. Board of County Comm'rs*, 115 N.M. 710, 858 P.2d 86 (Ct.App.1993). But this is not a civil statute we are asked to interpret. Section 30–4–4 creates a new criminal act, classifies it as a felony, and punishes it with serious imprisonment.

{15} In writing and construing the criminal law, both our state legislature and this Court owe the people of this state a duty of clarity. We cannot ask our citizens, or for

that matter those of a sister state, to guess at the meaning of a criminal statute. Common-sense notions of fair play, transposed into more formal doctrines of due process, demand no less. *See United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (discussing fair warning in a criminal statute as principle of due process); *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."). It has long been part of the common law that penal statutes are strictly construed against the state, and that "[a]ny doubts about the construction of penal statutes must be resolved in favor of lenity." *Santillanes v. State,* 115 N.M. 215, 221, 849 P.2d 358, 364 (1993). Simply put, it is the state's burden to draft its criminal laws with reasonable precision.

{16} When even the State, to its credit, concedes the essential ambiguity of this statute, we are duty bound to construe it in a manner that gives the benefit of the doubt to the accused. *See State v. Edmondson,* 112 N.M. 654, 658, 818 P.2d 855, 859 (Ct.App. 1991) ("[T]he touchstone of the rule of lenity is statutory ambiguity." (citation and internal quotation marks omitted)). We do so only when " 'a reasonable doubt persists about a statute's intended scope even *after* resort to "the language and structure, legislative history, and motivating policies" of the statute.' " *State v. Ogden,* 118 N.M. 234, 242, 880 P.2d 845, 853 (1994) (quoting *Edmondson,* 112 N.M. at 658, 818 P.2d at 859). Despite our efforts at divining the legislative will, we cannot conclude with the degree of confidence necessary in criminal matters that Mother's actions are "punishable in New Mexico" under Subsection J.

{17} If our reading of Section 30–4–4 is contrary to the legislature's will, either as originally promulgated in 1989 or as reflected in the changed needs of today's society, that body can, and should, re-address its work product to make its intentions clear. Until that time, our duty is clear. We hold that the jurisdictional limitation expressed in Sub-

section J applies to all criminal acts of custodial interference defined in Subsection B, including those alleged in the criminal indictment at issue in this case.

## CONCLUSION

{18} The district court's dismissal of the indictment against Mother for custodial interference is hereby affirmed.

{19} **IT IS SO ORDERED.**

WECHSLER, and BUSTAMANTE, JJ., concur.